**Affirmed in part; Reverse, Render and Remand in part and Opinion Filed March 13, 2015**




**In The**
**Court of Appeals**
**Fifth District of Texas at Dallas**

---

**No. 05-14-00566-CV**

---

**JANE MCCURLEY BACKES D/B/A BACKES QUARTER HORSES AND TRACY JOHNS, Appellants**

**V.**

**KAREN MISKO AND MISKO QUARTER HORSES, LLC, Appellees**

---

**On Appeal from the 429th Judicial District Court**
**Collin County, Texas**
**Trial Court Cause No. 429-01844-2013**

---

# OPINION

Before Justices Bridges, Lang, and Evans
Opinion by Justice Bridges

Appellant Jane McCurley Backes d/b/a Backes Quarter Horses ("Backes") sued appellees Karen Misko and Misko Quarter Horses ("Misko") for tortious interference and invasion of privacy. Appellee Tracy Johns ("Johns") filed a petition in intervention alleging tortious interference. Misko, individually, filed a counterclaim against Johns for libel and against Backes for civil conspiracy to commit libel. Backes and Johns filed motions to dismiss under the Citizens Participation Act, chapter 27 of the Texas Civil Practice and Remedies Code. The trial court denied both motions. On appeal, Johns and Backes argue they met their burdens under Chapter 27; therefore, the trial court erred by denying their motions to dismiss.

We affirm the trial court's order denying Johns's motion to dismiss. We reverse the trial court's order denying Backes's motion to dismiss and render judgment dismissing Misko's civil

conspiracy counterclaim against Backes. We remand Backes's case to the trial court for a determination of costs, attorney's fees and other expenses as authorized under section 27.009(a). *See* TEX. CIV. PRAC. & REM. CODE ANN. § 27.009(a) (West 2015).

**Background**

The background of this case involves three women who are competitors in the quarter horse breeding business, who used social media to interact with other horse enthusiasts about horse-related issues. However, the rhetoric between the women turned personal and as further explained below, Misko filed a libel suit against Johns and a conspiracy to commit libel suit against Backes after Johns raised the issue of Munchausen-Syndrome-By-Proxy ("MSBP") on a horse forum, and Misko believed the Post (as the parties refer to it throughout their briefing) related to her.

Throughout the years, Misko's daughter struggled with health issues. Misko often shared the struggles with others, including Backes and Johns, and mentioned the struggles on Facebook and horse forums. Doctors eventually diagnosed Misko's daughter in 2008 with a neurological disorder called Reflex Neurovascular Dystrophy.

On December 29, 2012, Misko posted a message on her Facebook wall requesting comments from readers about developing a ten-point evaluation system for five attributes in weanlings and yearlings for sale purposes. Within days, many people provided comments, including Backes and Johns. Backes commented about the subjectivity of such a point system because, "What you might think is a 9 I might think is a 6. It would all go back to person[al] opinions of likes and dislikes." Misko acknowledged the subjectivity but said her goal "is trying to educate everyone so that they may gain confidence in their decisions rather than relying upon a trainer or checking with 5-10 friends and then making a decision." Johns later asked Misko why ". . . would [you] want to discourage buyers from checking with friends and/or trainers prior

to purchasing?" Misko later clarified she would never discourage consulting with friends or trainers but was trying to establish a system to improve breeding.

In a January 1, 2013 response directed to Johns, Misko asked Johns the following, "So, Tracy, could you please answer the question from the last time that you came onto my wall and never responded to me? What would a trainer have to do to your horses to make you leave their barn and disrupt your loyalty to them? I am seriously interested in your answer and am still waiting." Johns claimed she missed the question, and said she would think about it. As others continued to provide input on the point system, Johns continued to argue it was a self-serving concept directed to support a particular breeder's ideas.

The banter continued between Johns and Misko regarding the point system, prior horse dealings, and the various trainers they had used in the past. Later, on January 1, 2013, Misko said to Johns:

> You have learned a great deal since 2002 from being bright, diligent, and having a great mentor, Tracy. I love your mind, work ethic, and outstanding care for your horses…you are impressive to me. Therefore, I simply want you to understand that I do like and respect you, but you and [Backes] do need to communicate on this wall with the proper facts concerning me, ok? . . . I am very happy to continue the discussion with you about this question but bringing in hidden agendas is a conflict I will not tolerate when you do not have many or all of the facts, whatsoever.

Misko's mention of Backes in her comment to Johns pulled Backes back into the Facebook chatter. Backes accused Misko of sounding like a lawyer and noted that "tones and questions on a computer vs live can come across wrong. Learn to give a person the benefit of the doubt :)." Misko responded that she could no longer give the two women the benefit of the doubt given the past three months of posts on her Facebook wall or Johns's "silly winking smiley faces." Misko's comment to Backes continued:

> Seriously? If a person would review both of your statements, about so many subjects on my wall, do we all go back to Jr. High? I think

> that tones are confused on the computer but patterns become crystal clear. We are acquaintances which is different than friends…we do not spend time together nor do we agree about choices regarding trainers. I respect you as a Mom and love what you have created with Audrey Grace's memory ... it is so, so wonderful. :) I respect you as a fellow breeder and have always told folks to go over and check out your horses. I appreciated the care that you provided for my mares ... it was great. Still, we do not spend time together nor talk except on FB which is fine, but to me, a friend is like Tracy is to you. . . . I am not angry in any way, but I am not going to play games on FB. . . . Also, I know that you do most of what I had mentioned which is why I did not think that you would object so adamantly about a grading system since it is what you do every year with every foal. Why not put it into writing for others on your website? Anyhow, I still think that we have gleaned many insights and great ideas if I can collect them in a more expedient and easier to read summation. :) As a last request, I will ask you, like I did with Tracy, what actions from a trainer, to your horses, would force you to take them from their care and violate your trust and loyalty to them? You have had so many years with trainers, that your answer is very meaningful to me, Jane. I sincerely mean this which is why I continue to ask the question from both of you. I do appreciate your efforts and sharing of knowledge which is why I think that we have gotten along for so many years ... out of respect as Moms and fellow horse owners and breeders, I am off to be with my wonderful daughter. This has been exhausting?? LOL

Backes then suggested Misko should put on the top of her page, "If your views are not like mine do not post." Backes continued to question Misko about Misko's previous problems with a breeder, whom Misko now said was great. Johns encouraged Misko to "take a break from the keyboard before you give yourself a stroke." A male commenter noted that "pissing matches should be kept private ladies."

In the middle of the above January 1, 2013 discussion on Misko's Facebook wall, Backes and Johns began posting messages on Backes's Facebook wall. One post, shared from "The Ramblings of a Crazy Bitch," featured the photo of a woman with the caption, "Did someone forget to put on their big girl panties?" Backes commented the post was not directed at Johns. Backes also mentioned that she tried to find the picture of a child sitting at a computer saying,

"the bitch blocked me," but she could not find it. Johns responded she could not find the picture because she changed phones. Johns then asked, "Is it appropriate to do a preemptive strike?" Backes said no and that she wanted to figure out how Misko "gets out of the lie about my personal emails with her flat out talking bad about her new mentor." Backes then asked if it was legal to post the emails. The next day, Misko saw these Facebook posts and advised Backes to check with her legal advisor.

When another person inquired about the "drama," Backes accused Misko of erasing comments regarding people's contrary opinions on the ten-point system and responding to Backes's and Johns's criticism with "looooong, passive-aggressive posts . . . All while blinking her eyes in Disney Princess innocence . . . Hoping her followers don't see her for who she is?" Misko denied erasing posts, and both women claimed to have preserved every word about recent exchanges. This ended the early January 2013 communications between Misko, Johns, and Backes.

Towards the end of January 2013, the women once again began attacking each other on social media. Backes served as moderator of the "Who to Breed To" posting thread on a horse-related site called "Pleasurehorse." Posts on the site included topics ranging from horse sales, pricing, and breeding services. On the site, Misko posted under the name "karenmisko." Backes posted as "marepower," and Johns posted as "tmk5."

In an affidavit attached to her response to the motions to dismiss, Misko claimed Backes announced on the "Who to Breed To" thread that one of Backes's stallions tested positive for the HERDA genetic skin disease. This statement was inconsistent with several prior posts in which Backes claimed the stallion was HERDA negative. When Misko raised questions about the genetic testing of the stallion, Misko stated Backes immediately began personally attacking her through posts on the thread regarding her mental status and her horse breeding program. Backes,

as moderator, deleted these postings. Backes admitted to deleting the thread; therefore, the content of the posts are in the record only through affidavit testimony.

Backes and Misko continued to bicker on the "Pleasurehorse" forum. In the early hours of January 29, 2013, Backes posted, "So for every sin you decided I committed it all goes back to just not liking me which I can live with. Now some of our fun debates I will miss but stalking me down wherever I post and even correcting my bad spelling is something I can live without." Within an hour, Misko unfriended Backes and Johns from her Facebook account because although she could accept criticism and suggestions, she refused to tolerate such things when "mixed with innuendo or false facts."

On February 9, 2013 at 3:17 p.m., Johns, under her "tmk5" screen name, posted the following message (referred to as the "Post" by the parties) in a new thread on the "Anythingshowhorse" Delphi Forum:

> General- Munchausen Syndrome by Proxy
>
> From: tmk5
> to: All
>
> Has anyone ever known anyone with this disease/issue?
>
> If you have STRONG suspicions…to whom do you turn them over?
>
> I know this is a horse forum…but people have such vast life experiences, I thought someone could point me in the right direction.[1]

Within an hour, "trublu11" responded, "I can think of someone that fits the pattern that's for sure. You can message me for some more info if needed." Shortly thereafter, Johns responded to "trublu11" and said, "Thanks! Just odd behavior by one of the parents and has been going on for some time." At 5:26 p.m., "dazookeeperz" replied to "tmk5" as follows:

[1] The ellipses are present in the original Post and do not indicate any deletion of text.

> Seriously, Tracy,
>
> What is WRONG with you, Jane and the other minions? It's one thing to bicker amongst our adult selves. You are now going to bring children into it? My advice to you would be to batten down the hatches. I have a feeling this is a low blow that will not even be tolerated.
>
> Shame on you. Shame on the others.

Another comment by "lynnesmyname," shared similar sentiments:

> Everyone can see right through you Tracy. What is wrong with you people. Do you not see how foolish you make yourself look coming on here saying that trash. You are a sad pathetic person and if you really had a concern for a child that might be the subject of this you certainly would not come on a public HORSE forum to see what to do. You're a smart lady Tracy, surely you could figure out where to report such a person.
>
> Shameful, nasty, pathetic does not even describe this latest behavior.

"Dazookeeperz" later added, "Everyone knows the venom you spew for your BFF Jane. . . ." "Lynnesmyname" also added, "The two of them only do or say whatever suits them at the time its spewing out of their collective mouths . . . When you need to have the last word, call out a child and say something horrific about their parent. Good job Tracy, you win…happy now?" Johns responded back at 8:19 p.m. on February 9, 2013 with the following:

> I want to thank everyone for the MULTITUDE of private emails and messages to me over the last hour or so. From those messages and three phone calls...I now have a GREAT resource available to help this child…that I was somehow attacked for trying to help.
>
> This makes no sense to me…and now I understand why people get tired of posting on forums.
>
> The people attacking me should be ASHAMED of themselves. EVERYONE that knows me closely…knows that I have worked since 1997 when my oldest daughter was born…to help children, whether through a formal organization or not. This is something near and dear to me, and always will be.
>
> So today's learning…unless you are bashing someone…don't post.

Got it.

On February 10, Johns was called out by one forum member for "playing the victim" and another member posted that "anyone with half an ounce of intelligence would know immediately to call local (or jurisdictional) child protective services; they wouldn't go on a horse forum and ask what to do about it" because "that's just blatantly devious." Misko responded to Johns on the same day and informed her that Misko's attorney would be contacting her about the names of the mother and child referred to in the Post for a thorough investigation. Misko also told Johns she contacted the moderator of the thread to lock it down so it could not be deleted.

Misko stated in her affidavit she understood the Post to be directed at her and her daughter, and she believed it implied she needed to be reported to authorities for abusing her daughter as a result of MSBP. She stated any such accusation was utterly and completely false. Dr. V. Frank Cody, a psychiatrist and psychoanalyst who has treated Misko intermittently since 1984 and on occasion treated her daughter, also provided an affidavit stating Misko does not suffer from, and has never suffered from, or acted against her daughter as a result of MSBP.

Misko stated that within days of the Post, she received several Facebook messages from people she did not know asking her, "How could you have done that to your daughter since you take such good care of your horses," and "I did not think you were capable of such a thing." Despite Misko attaching almost one hundred pages of screen shots from Facebook and the Delphi Forum of the women's conversations, she did not attach copies of these alleged messages to her affidavit.

Misko later obtained affidavits from Geraldine White, Karen Redding, Barbara Mahon, Marci Braddock, and Paula Hogan, none of whom had ever met her, but they had communicated on message boards. The women stated that based on the prior attacks by "tmk5" and "marepower," they understood the Post "referred to Karen Misko and her daughter, and I

believed it implied that Karen Misko needed to be reported to proper authorities because she had mistreated her daughter as a result of Munchausen Syndrome by Proxy."

On May 9, 2013, Backes filed a lawsuit alleging tortious interference and invasion of privacy based on Misko's alleged communications with a genetics laboratory in early 2013 regarding the HERDA test results on Backes's stallion. Backes argued that because of Misko's misleading publications about the stallion and his suitability as a breeding partner, prospective breeders elected not to enter into contracts with her. Johns filed her original petition in intervention the same day alleging tortious interference based on Misko's alleged online harassment of would-be buyers of quarter horses who posted inquiries on Johns's Facebook wall. Misko answered Backes's petition on June 5, 2013 and answered Johns's petition in intervention on July 13, 2013.

On January 27, 2014, Misko filed an original counterclaim against Johns for libel and against Backes for civil conspiracy to commit libel. She alleged the Post by Johns constituted libel per se and Backes and Johns were "primarily involved in the business of selling services that compete with Misko and the internet postings that give rise to this libel action arose out of a commercial transaction in which the intended audience was actual or potential buyers or customers." Misko further alleged Johns and Backes had a meeting of the minds for the purpose of wrongfully defaming her in a commercial setting in order to harm her reputation and business.

Backes and Johns filed motions to dismiss pursuant to Texas Civil Practice and Remedies Code chapter 27. Johns argued Misko's counterclaim was brought in response to her exercise of protected speech, and Backes argued the counterclaim was an improper response to her right of association. They further challenged Misko's ability to provide clear and specific evidence for each essential element of her libel and civil conspiracy claim.

The trial court held a hearing on the motion to dismiss on May 6, 2014. The trial court asked the parties to address two issues: (1) whether or not the claims are exempt under the chapter; and (2) the issue that no name is specifically mentioned in the Post. The trial court took the motions under advisement, but denied them both, without specifying the reason, on May 7, 2014. This interlocutory appeal followed. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 51.014(a)(12) (West 2015) (allowing interlocutory appeal from an order denying a motion to dismiss filed under section 27.003 of the Texas Civil Practice and Remedies Code).

**Chapter 27 Standard of Review**

Chapter 27 of the Texas Civil Practice and Remedies Code creates an early-dismissal mechanism intended to "encourage and safeguard the constitutional rights of persons to petition, speak freely, associate freely, and otherwise participate in government to the maximum extent permitted by law" while simultaneously protecting the rights of persons with meritorious claims. TEX. CIV. PRAC. & REM. CODE ANN. § 27.002 (West 2015). Statutes like chapter 27 are commonly known as "anti-SLAPP statutes" because they are intended to curb "strategic lawsuits against public participation." *See Am. Heritage Capital, LP v. Gonzalez,* 436 S.W.3d 865, 869 (Tex. App.—Dallas 2014, no pet.).

Chapter 27 instructs a trial court to dismiss a legal action if the party filing the motion to dismiss shows by a preponderance of the evidence that the action is based on, relates to, or is in response to the movant's exercise of her right to free speech or exercise of the right of association. TEX. CIV. PRAC. & REM. CODE ANN. § 27.005(b)(1), (3) (West 2015). The "[e]xercise of the right to free speech" is defined as "a communication made in connection with a matter of public concern." TEX. CIV. PRAC. & REM. CODE ANN. § 27.001(3). A "[m]atter of public concern" includes an issue related to "health or safety." TEX. CIV. PRAC. & REM. CODE ANN. § 27.001(7) (West 2015). The "[e]xercise of the right of association" is defined as "a

communication between individuals who join together to collectively express, promote, pursue, or defend common interests." TEX. CIV. PRAC. & REM. CODE ANN. § 27.001(2).

When determining whether a legal action should be dismissed under chapter 27, the trial court considers the pleadings and supporting and opposing affidavits stating the facts on which the liability or defense is based. TEX. CIV. PRAC. & REM. CODE ANN. § 27.006 (West 2015). The statute further instructs that the chapter "shall be liberally construed to effectuate its purpose and intent fully." TEX. CIV. PRAC. & REM. CODE ANN. § 27.011 (West 2015).

We review de novo whether Johns established by a preponderance of the evidence that she was exercising her right of free speech when she made the Post and whether Backes established by a preponderance of the evidence that she was exercising her right of association by engaging in a friendship with Johns in which they both posted on social media. *See Pickens v. Cordia*, 433 S.W.3d 179, 184 (Tex. App.—Dallas 2014, no pet.) (noting every Texas court of appeals to address standard of review has concluded the first prong is reviewed de novo); *see also Cruz v. Van Sickle*, No. 05-13-00191-CV, 2014 WL 6850971, at *4 (Tex. App.—Dallas Dec. 3, 2014, no pet.); *see also* TEX. CIV. PRAC. & REM. CODE ANN. § 27.005(b).

If Johns and Backes, as the movants, establish by a preponderance of the evidence that Misko's suit is based on, relates to, or is in response to their exercise of these rights, section 27.005(b) requires dismissal of the suit unless Misko "establishes by clear and specific evidence a prima facie case for each essential element of the claim in question." TEX. CIV. PRAC. & REM. CODE ANN. §§ 27.003, .005(b), (c). The purposeful inclusion of this "clear and specific" requirement indicates Misko must satisfy an elevated evidentiary standard under section 27.005. *See Young v. Krantz*, 434 S.W.3d 335, 343 (Tex. App.—Dallas 2014, no pet.).

We first consider whether Johns and Backes met their initial burden under section 27.005(b). TEX. CIV. PRAC. & REM. CODE ANN. § 27.005(b).

## Johns's Burden Under Section 27.005(b)

Section 27.005(b) requires the trial court to dismiss, except as provided by subsection (c), if Johns shows by a preponderance of the evidence that Misko's libel suit is based on, relates to, or is in response to Johns's right of free speech. *Id*. Johns argues the Post related to a "matter of public concern," defined under the chapter to include issues related to "health or safety." TEX. CIV. PRAC. & REM. CODE ANN. § 27.001(3), (7)(A). She specifically claims "a question about a psychological condition/mental disorder—clearly involved 'issues related to . . . health or safety.'" Misko has not provided any argument challenging Johns's contention that she was exercising her right of free speech. However, because Johns's must first meet her burden under section 27.005(b) that she was exercising her right of free speech, Misko's failure to respond in the trial court or on appeal is of no consequence.[2]

Although the definition of "matter of public concern" is defined to include an issue related to "health or safety," chapter 27 does not define these terms. Undefined terms in a statute are typically given their ordinary meanings, but if a different or more precise definition is apparent from the term's use in the context of the statute, we apply that meaning. *Lanier v. E. Found., Inc.*, 401 S.W.3d 445, 462 (Tex. App.—Dallas 2013, no pet.).

The dictionary defines "health" to mean "the state of being sound in body or mind." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1043 (1981). It defines "safety" to mean "the condition of being safe: freedom from exposure to danger: exemption from hurt, injury, or loss." *Id*. at 1998. We consider these definitions along with the purpose of chapter 27, which "is to encourage and safeguard the constitutional rights of persons to petition, speak freely, associate freely, and otherwise participate in government to the maximum extent permitted by law and, at

[2] In Misko's response to the motions to dismiss, she relied on the commercial speech exemption provided by section 27.010 and argued, "Even if Chapter 27 applies to Misko's claims," she established a prima facie case on each essential element by clear and specific evidence.

the same time, protect the rights of a person to file meritorious lawsuits for demonstrable injury." TEX. CIV. PRAC. & REM. CODE ANN. § 27.002.

Under the facts of this case, the Post created by Johns to "all" in the "Anythingshowhorse" public Delphi Forum inquired as to whether anyone knew someone with MBPS, and "If you have a STRONG suspicion...to whom do you turn them over?" MBPS is described in the American Psychiatric Association's DSM as falsification of physical or psychological signs or symptoms, or induction of injury or disease, in another, associated with identified deception. Asking others about information related to a recognized psychological disorder is clearly an inquiry into someone's state of mind, which falls under the definition of "health." By stating her strong suspicion that someone suffered from MBPS, Johns indicated a child was suffering abuse from a parent. Thus, Johns's statement not only involved a matter of someone's health, but also a child's safety. Because Johns's statement related to health or safety, it fell within the statutory definition of "matter of public concern." TEX. CIV. PRAC. & REM. CODE ANN. § 27.001(7); *see Shipp v. Malouf*, 439 S.W.3d 432, 438 (Tex. App.—Dallas 2014, pet. denied) ("A matter of public concern is defined broadly; therefore, the legislature expressed its intent that the statute, enacted to protect the right of free speech, be construed broadly."); *see also Nguyen v. Dallas Morning News, L.P.*, No. 2-06-298-CV, 2008 WL 2511183, at *5 (Tex. App.—Fort Worth June 19, 2008, no pet.) (mem. op.) ("Protection of children from abuse is of the upmost importance in Texas.").

While case law is scarce discussing what constitutes a "matter of public concern" related to "health or safety," we find support for our conclusion by distinguishing *Pickens v. Cordia*, 433 S.W.3d 179 (Tex. App.—Dallas 2014, no pet.) and *Whisenhunt v. Lippincott*, 416 S.W.3d 689 (Tex. App.—Texarkana 2013, pet. filed).

In *Pickens*, the appellees sued appellant for invasion of privacy by public disclosure of private facts, defamation, statutory libel, and intentional infliction of emotional distress for remarks Pickens published on his blog about family members. *Id*. at 181. Pickens moved to dismiss the case under chapter 27 alleging appellees' lawsuit implicated his right to freedom of speech. *Id*. at 182. In addressing the first prong, Pickens argued his blog concerned issues related to "addiction, parental abuse, fathers' responsibilities to their children and family dynamics," all of which he contended related to health and safety. *Id*. at 184. This court agreed these issues "generally may be matters of public concern," but Pickens's blog was "more akin to a personal diary of his journey from drug addiction to recovery in which he draws upon his perceived family experiences . . . . Its primary focus is Michael." *Id*. As such, the type of private life statements recounted on the blog did not "implicate the broader health and safety concerns or community well-being concerns contemplated by chapter 27." *Id*.

In reaching its conclusion, *Pickens* relied on *Miranda v. Byles*, 390 S.W.3d 543 (Tex. App.—Houston [1st Dist.] 2012, pet. denied). Although not a chapter 27 case, *Miranda* discussed private facts and public issues. The case involved a step-grandfather who sued for slander and intentional infliction of emotional distress after the defendant made false statements that he sexually assaulted his step-granddaughter. *Id*. at 548. On appeal, the appellant challenged the trial court's finding that the sexual abuse allegations were a private, rather than a public, issue. *Id*. at 554. The appellant argued allegations of sexual abuse "implicate a question of public importance." *Id*. In determining whether the issue was a private matter, the appellate court noted an issue is not a public issue simply because it is a controversy of interest to the public. *Id*. A matter can be a public issue because people in the public are discussing it or because people other than the immediate participants in the controversy are likely to feel the impact of its resolution. *Id*. In concluding the trial court did not err in determining the alleged

sexual assault was a private issue, the appellate court noted there was no evidence in the record the matter was being discussed by anyone other than officials in charge of the investigation and the family. *Id*. Nor was there any evidence anyone other than the family was likely to feel the impact of the resolution. *Id*.

Thus, relying on *Miranda* and following a similar analysis, *Pickens* concluded there was no evidence suggesting the public was discussing Pickens's blog or that anyone other than family members would likely feel the impact from it. *Pickens*, 433 S.W.3d at 185. As such, Pickens's blog entries describing personal drug addiction and abuse did not implicate a matter of public concern to satisfy his initial burden under section 27.005(b) that his family's lawsuit was in response to his right to free speech. *Id*. at 185. Thus, the trial court properly denied his motion to dismiss. *Id*. at 187.

In *Whisenhunt*, a nurse anesthetist filed suit against the defendants, with whom he had worked, for several causes of action including defamation. 416 S.W.3d at 691. Attached to Whisenhunt's petition were internal emails containing the alleged defamatory remarks. *Id*. The defendants moved to dismiss the lawsuit under chapter 27 arguing the emails related to matters of public concern "in the areas of health and safety, community well-being, and a service in the market place" because they discussed Whisenhunt's conduct as a nurse. *Id*. at 697. The trial court agreed and granted the motion. The court of appeals reversed concluding "the TCPA does not apply to speech that is only privately communicated." *Id*. at 700. A person must be exercising his right to speak freely in public for chapter 27 to apply and internal emails were not of a public nature. *Id*.

Here, unlike *Pickens* and *Whisenhun*t, the Post was not on someone's personal blog or contained in private emails between individuals, but rather written in a public internet forum frequently visited by others. The Post invited responses and in fact, garnered both positive and

negative replies. It received 1255 views and one hundred twenty-six responses, seventeen of which are in the record. Thus, unlike *Pickens* and *Miranda*, the record contains evidence that people besides Johns, Backes, and Misko engaged in discussions about the Post.

Accordingly, we conclude the evidence shows the Post was a communication made in connection with an issue of public concern. Thus, Johns was exercising her right of free speech, and Misko's lawsuit is based on, relates to, or was filed in response to Johns's exercise of that right.

**Backes's Burden Under Section 27.005(b)**

We now address whether Backes met her burden of showing by a preponderance of the evidence that Misko's civil conspiracy suit is based on, relates to, or is in response to Backes's right of association. Chapter 27 defines the exercise of the right of association as "a communication between individuals who join together to collectively express, promote, pursue, or defend common interests." TEX. CIV. PRAC. & REM. CODE ANN. § 27.001(2).

In Misko's counterclaim against Backes, Misko described the disagreements posted between the women on social media beginning in January 2013. She asserted that while some of the postings involved issues of "shared concern and interest among the internet horse community, such as genetic testing, others were personal attacks against Misko and her business." Misko further contended that after she complained about the tenor of Backes's posts on the forum in which Backes served as moderator, Backes was removed as moderator in February 2013. Misko alleged she believed Backes blamed her for removal and "in spite, sought revenge against Misko." Shortly thereafter, the Post appeared on the "Anythingshowhorse" Delphi Forum. Misko alleged Johns and Backes, acting in concert, were "negligent in writing and publishing the postings about Misko discussed above on the internet."

While Misko's counterclaim focuses on the Post, she also supports her conspiracy claim against Backes by relying on the heated discussions between the women over Misko's suggested point system, over the genetic testing of Backes's stallion, and over Backes's removal as moderator of the forum to support her contention that Backes sought revenge against her. These types of discussions clearly fall under the "right of association" as they were "communication[s] between individuals who join together to collectively express, promote, pursue, or defend common interests" within the horse community. TEX. CIV. PRAC. & REM. CODE ANN. § 27.001(2); *see Combined Law Enforcement Ass'n of Tex. v. Sheffield*, No. 03-13-00105-CV, 2014 WL 411672, at *5 (Tex. App.—Austin Jan. 31, 2014, pet. filed) (mem. op.) (alleged defamatory emails sent by the executive director of a law enforcement labor union to members of the union fell within chapter 27 definition of "right of association" because the content of the emails were communications between individuals joined together to collectively express, promote, or defend the common interests of police officers).

As Backes argued in her motion to dismiss, Misko's claim does nothing more than attack and complain about Backes's right of association: "[T]he counterclaim against Backes is based on, relates to, or is in response to Backes purportedly exercising her right to associate with Johns, who in turn apparently exercised her protected right of speech in a manner Misko found offensive . . . ." We agree. Johns and Backes are close friends. As friends, they have the right to associate with each other on social media, particularly when it involves a common interest such as horse breeding.[3] Thus, Misko's lawsuit is based on, relates to, or was filed in response to Backes's association with Johns on social media.

[3] During oral argument, Misko argued for the first time that Backes should not be allowed to deny her involvement in the Post and at the same time, seek dismissal under chapter 27 based on her right of association. She argued such an argument flies in the face of this court's holding in *Pickens*, in which we held that when a motion to dismiss is premised on the right to speak freely, yet the person filing the motion denies writing the very communication that is the focus of the motion, chapter 27 does not apply. 433 S.W.3d at 188. Misko did not raise this argument in her brief; therefore, we will not address it. *See* TEX. R. APP. P. 39.2 ("Oral argument should emphasize and clarify the written

Before addressing whether Misko met her burden under section 27.005(c) to provide clear and specific evidence of each essential element of her claims against Johns and Backes, we address Misko's argument that the commercial speech exemption applies and supports the trial court's denial of the motions to dismiss. *See* TEX. CIV. PRAC. REM. CODE ANN. § 27.010 (West 2015); *see also Better Bus. Bureau of Metro. Dallas, Inc. v. BH DFW, Inc.*, 402 S.W.3d 299, 309 (Tex. App.—Dallas 2013, pet. denied) (concluding that after the Better Business Bureau established the business review fell within the exercise of free speech as defined by chapter 27, BH DFW had the burden to establish the communication was exempt from the statute).

**Application of Section 27.010 Exemption**

Misko argues she proved her claims are exempt from dismissal under section 27.010. Johns and Backes respond the Post does not relate to or arise from any of the parties' business activities; therefore, the exemption does not automatically apply to deny dismissal of their claims. As explained below, we agree with Johns and Backes.

Section 27.010(b) states:

> [The TCPA] does not apply to a legal action brought against a person primarily engaged in the business of selling or leasing goods, or services, if the statement or conduct arises out of the sale or lease of goods, services, or an insurance product, insurance services, or a commercial transaction in which the intended audience is an actual or potential buyer or customer.

TEX. CIV. PRAC. & REM. CODE ANN. § 27.010(b). This section is described as a "commercial speech exception." *Newspaper Holdings, Inc. v. Crazy Hotel Assisted Living, Ltd.*, 416 S.W.3d 71, 89 (Tex. App.—Houston [1st Dist.] 2013, pet. denied). It has been construed to mean that for the exemption to apply, the statement must be made for the purpose of securing sales in the

---

arguments in the briefs."); *see also Foster v. Richardson*, 303 S.W.3d 833, 839 n.6 (Tex. App.—Fort Worth 2009, no pet.) (refusing to consider arguments raised in oral argument about deficiencies in an expert affidavit that were not raised in brief).

goods or services of the person making the statement. *Id*. at 88–89. The party asserting the exemption bears the burden of proving its applicability. *Id*. at 89.

Misko alleged in her counterclaim that Backes and Johns are competitors in the horse breeding and sales business. She further alleged, "Backes and Johns are primarily involved in the business of selling services that compete with Misko and the internet postings that give rise to this libel action arose out of a commercial transaction in which the intended audience was actual or potential buyers or customers." Her reference to "internet postings" relates only to the Post; therefore, our analysis of whether the exemption applies focuses on (1) whether Misko's libel and conspiracy claims are against Johns and Backes, as individuals primarily engaged in the business of selling or leasing goods or services in the quarter horse industry; (2) whether the statements made in the Post "arise out of" the sale or lease of goods or services in the quarter horse business; and (3) whether the intended audience for the Post was an actual or potential buyer or customer. If Misko fails to provide evidence supporting any one of these elements, she has not met her burden to prove the applicability of the exemption.

Misko relies on Backes's statement in her original petition that Misko is a "competitor of Plaintiff's in the quarter horse breeding business" and Johns's statement in her petition in intervention that Misko is "a sometime competitor of Intervenors in the quarter horse business" as evidence that Backes and Johns are primarily engaged in selling horses and horse-breeding services. Misko also relies on her affidavit in which she explains how she utilizes the internet to promote and market her business and to locate customers. She then summarily states, "I know that Backes and Johns also use the internet, and particularly Facebook and the Delphi Forum horse-related sites, to promote and conduct their horse-breeding and horse-sale businesses in similar fashion." Misko alleges the exhibits she attached to her affidavit, which consist of screenshots of internet postings, establish further proof. We do not agree.

Regardless of whether Misko is a competitor with Backes or a sometimes competitor with Johns in the quarter horse business, this is not evidence that Johns and Backes are *primarily* engaged in the business of selling or leasing goods or services in the quarter horse industry. In fact, in a December 31, 2012, 6:10 p.m. post, Backes said to Misko, "I have a full time job raising money for charity and breeding has to come second."

The internet postings Misko attached to her affidavit, and detailed at length above in the background section, reference (1) the women's disagreements about Misko's suggested point system, (2) the postings on Backes's personal Facebook wall, and (3) the comments on the Delphi Forum regarding whether Backes's stallion tested HERDA positive. While we agree these posts shed light on the women's interactions and their ideas within the quarter horse industry, we do not agree the posts provide any evidence that Johns and Backes are "primarily engaged in the business of selling or leasing goods or services."

Even if we determined Johns and Backes are primarily engaged in the business of selling or leasing goods or services, Misko failed to meet her burden that the Post "[arose] out of the sale or lease" of these goods or services. Misko asks this court to consider the entire background of exchanged postings between the parties and the alleged suspicious timing of the Post to conclude the Post arose out of the sale or lease of goods or services.

Section 27.010 clearly states the chapter does not apply to an action if the statement arises out of the sale or lease of goods or services. On its face, the Post concerns a general inquiry into whether anyone is familiar with MSBP and if so, asks for information about reporting a suspected individual. Nothing within the Post involves the sale or lease of any goods or services related to the quarter horse industry or any other related business. Thus, the Post does not arise out of the sale or lease of goods or services.

In reaching this conclusion, *Kinney v. BCG Attorney Search, Inc*., No. 03-12-00579-CV, 2014 WL 1432012 (Tex. App.—Austin, Apr. 11, 2014, pet. denied) (mem. op.) is instructive. In that case, BCG sued Kinney for breach of contract, breach of fiduciary duty, and violations of the Lanham Act based on statements Kinney made in a post on an internet website. *Id*. at * 1. While the opinion does not provide the details of the internet post, the court noted Kinney made a single post describing BCG's business operations "based on his experience as a former employee," and Kinney wrote negative opinions about BCG's owner and the company. *Id*. Kinney posted anonymously and the post contained no reference to Kinney or his business. *Id*. BCG argued Kinney's statements did "arise out of" the sale of Kinney's services because Kinney was in the business of selling legal recruiting services and "it is 'obvious' that Kinney would not have made the post had it not been for the fact that he and BCG were competitors." *Id*. at *6. The court did not find this argument persuasive. It noted Kinney posted anonymously on a website, and his comments made no reference whatsoever to his business or the sale of his services. *Id*. at *7. The court further stated BCG offered no evidence the post was "for the purpose of obtaining approval for, promoting, or securing sales or leases of, or commercial transactions in, [Kinney's] goods or services or in the course of delivering [Kinney's] goods or services." *Id*.

Similar to Kinney's post, Johns made no reference whatsoever in the Post to her alleged horse business or the sale of any horses or horse-related services. Misko's reasoning for the Post is similar to BCG's "it's obvious" argument. However, Misko failed to bring forth evidence, except speculation and suspicious timing, that the Post arose out of the sale or lease of goods or services. Thus, Misko failed to meet her burden that Johns's statement or Backes's conduct fell within section 27.010's exemption.

Having concluded the exemption does not apply, we now address whether Misko met her burden of providing clear and specific evidence to support each element of her claims against Johns and Backes. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 27.005(c).

**Misko's Burden Under Section 27.005(c) as to Her Libel Claim Against Johns**

To avoid dismissal of her lawsuit, Misko was required to bring forth clear and specific evidence establishing a prima facie case for each essential element of her libel claim against Johns. TEX. CIV. PRAC. & REM. CODE ANN. § 27.005(c). Johns argues Misko failed to meet her burden because (1) the Post did not concern Misko as a matter of law and (2) the Post is a protected expression of opinion.

As to Misko's burden, the statute does not define "clear and specific." Therefore, we apply the ordinary meaning of these terms. *Schimmel v. McGregor*, 438 S.W.3d 847, 855-56 (Tex. App.—Houston [1st Dist.] 2014, pet. filed). "Clear" means "unambiguous," "sure," or "free from doubt," and "specific" means "explicit" or "relating to a particular named thing." *KTRK Television, Inc. v. Robinson*, 409 S.W.3d 682, 689 (Tex. App.—Houston [1st Dist.] 2013, pet. denied) (citing BLACK'S LAW DICTIONARY 268, 1167 (8th ed. 2004)).

Libel is defamation expressed in written or other graphic form. TEX. CIV. PRAC. & REM. CODE ANN. § 73.001 (West 2011). A written expression encompasses one that appears as text on an internet website. *See Kaufman v. Islamic Soc'y of Arlington*, 291 S.W.3d 130, 144–45 (Tex. App.—Fort Worth 2009, pet. denied). A libel plaintiff must prove that the defendant (1) published a statement; (2) that was defamatory concerning the plaintiff; (3) while acting with either actual malice, if the plaintiff was a public official or public figure, or negligence, if the plaintiff was a private individual, regarding the truth of the statement. *Rehak*, 404 S.W.3d at 727 (citing *WFAA–TV, Inc. v. McLemore*, 978 S.W.2d 568, 571 (Tex.1998)).

A statement is defamatory if it tends to injure the subject's reputation, to expose her to public hatred, contempt, ridicule, or financial injury, or to impeach her integrity, honesty, or virtue. *Am. Heritage Capital, LP*, 436 S.W.3d at 875. A statement may be false, unpleasant, abusive, or objectionable without being defamatory in light of the surrounding circumstances. *Id*. Whether a statement is capable of a defamatory meaning is initially a question of law for the court. *Id*. Moreover, to be actionable, a statement must assert an objectively verifiable fact rather than an opinion. *Id*.; *see also Main v. Royall*, 348 S.W.3d 381, 389 (Tex. App.—Dallas 2011, no pet.). Merely expressing a defamatory statement in the form of an "opinion" does not shield it from tort liability because opinions often imply facts. *Avila v. Larrea*, 394 S.W.3d 646, 658 (Tex. App.—Dallas 2012, pet. denied). We classify a statement as fact or opinion based on the statements verifiability and the entire context in which the statement was made. *Bentley v. Bunton*, 94 S.W.3d 561, 581 (Tex. 2002). Whether a statement is a statement of fact or opinion is also a question of law. *Am. Heritage Capital, LP*, 436 S.W.3d at 875.

As to the first libel element, it is undisputed Johns authored the Post. Further, Johns does not challenge or argue on appeal that Misko failed to prove Johns acted negligently regarding the truth of the statement. Therefore, we focus our analysis on the second libel element: whether Misko provided clear and specific evidence the Post was defamatory as to her.

Johns first argues the Post did not concern Misko as a matter of law because the Post did not specifically name her. To establish that the Post "concerned" her, Misko needed to prove the Post was specifically directed towards her. *Kaufman*, 291 S.W.3d at 144. In other words, "[i]n order to entitle one to maintain an action for an alleged defamatory statement, it must appear that he is the person with reference to whom the statement is made." *Id*. (citing *Newspapers, Inc. v. Matthews*, 339 S.W.2d 890, 893 (Tex. 1960)). However, it is likewise true that it is not necessary for the individual referred to be named if those who knew and were acquainted with

Misko understood from reading the Post that it referred to her. *Matthews*, 339 S.W.2d at 894; *Kaufman*, 291 S.W.3d at 145; *Houseman v. Publicaciones Paso del Norte, S.A. DE C.V.*, 242 S.W.3d 518, 525 (Tex. App.—El Paso 2007, no pet.) ("A publication is 'of and concerning the plaintiff' if persons who knew and were acquainted with him understood from viewing the publication that the defamatory statement referred to him."); *Allied Mktg. Group, Inc. v. Paramount Pictures Corp.*, 111 S.W.3d 168, 173 (Tex. App.—Eastland 2003, pet. denied).

Misko attached several affidavits to her response to the motions to dismiss. Geraldine White testified she was familiar with the postings of Misko, Johns, and Backes on the various horse forums. She knew of Misko's daughter's prior health struggles because Misko occasionally commented on them in postings on Facebook and the Delphi Forums. White also read the back and forth comments between Misko and Backes concerning Backes's stallion testing HERDA positive on the deleted "Who To Breed To" Forum.

Then, on January 31, 2013, White received an email from Karen Thompson in which she described Misko as a "bit of a strange duck." Thompson also shared her suspicions that Misko had a "major case of Munchausen's by proxy reading the trials and tribulations of her daughter." When White read the Post several days later, based on Thompson's email and the dissention between Johns, Backes, and Misko on social media, White "understood the posting as pointing to Karen Misko and her daughter, and I believed it implied that Karen Misko needed to be reported to the authorities because she had mistreated her daughter as a result of Munchausen Syndrome by Proxy." White further explained the Post did not pose a real question, but instead made an accusation that Misko was a child abuser.

Karen Redding, Barbara Mahon, Marci Braddock, and Paula Hogan, also provided affidavits stating their familiarity with the women and their interactions on various social media

sites. They also testified they believed the Post was directed at Misko and her daughter and that the Post insinuated Misko should be reported to authorities for abusing her daughter.

These women's affidavits unambiguously and explicitly state they knew upon reading the Post that it related to Misko. Although the Post did not refer to Misko by name, the evidence is "clear" and "specific" to establish the Post "concerned" Misko because those who knew and were acquainted with her understood from reading the Post that it referred to her. *Matthews*, 339 S.W.2d at 894; *Kaufman*, 291 S.W.3d at 145.

Although not a chapter 27 case, we find the libel analysis in *Diaz v. Rankin*, 777 S.W.2d 496 (Tex. App.—Corpus Christi 1989, no writ) similar to the present facts. In that case, two owners of a golf course filed a libel and slander suit after the defendant made a statement during a radio broadcast pertaining to the location of a golf tournament and "whether participants would have to go up there and play with dope dealers." *Id*. at 498. Plaintiffs admitted the broadcast did not mention them by name, but referred to the owner and operator of the golf course. *Id*. Defendants moved for summary judgment arguing, among other things, the statements were not defamatory because they did not mention the plaintiffs or the golf course. *Id*. In response to the summary judgment, plaintiffs attached an affidavit in which one listener testified he knew the broadcasted statement referred to the plaintiffs because they owned the golf course and were registered participants in the tournament. *Id*. In concluding a fact issue existed to deny summary judgment, the court recognized a statement does not have to specifically name a plaintiff to be defamatory. *Id*. at 499. "Every listener does not have to understand the statement to be a reference to the individual plaintiff as long as there are some who reasonably do." *Id*.; *see also Allied Mktg. Group, Inc*., 111 S.W.3d at 173 (the "of and concerning" issue is whether persons viewing the televised segment regarding an alleged sweepstakes scam thought the segment referred to the actual company who conducted sweepstakes despite the broadcast's attempt to use

a fake company name, and plaintiff provided evidence in support of its defamation suit that some viewers thought the segment accused the actual company of engaging in a sweepstakes scam). Thus, similar to the *Diaz* affidavit, Misko's affidavits, which each contained screenshots of the Post and subsequent comments, established evidence that some of the readers of the Post reasonably understood the statements to be a reference to her. *Cf. Fitzmaurice v. Jones*, 417 S.W.3d 627, 633 (Tex. App.—Houston [14th Dist.] 2013, no pet.) (passing reference to "lies" spread on Facebook did not meet burden of establishing clear and specific evidence of libel claim when party failed to attach any evidence of statements appearing on Facebook to petition or response to motion to dismiss). Therefore, we conclude Misko established the Post concerned her.

We now turn to Johns's argument that the Post was not defamatory because it was a protected expression of opinion. Johns contends a statement that is nothing more than rhetorical hyperbole is not actionable as defamation, and "Misko even characterizes the Post [as] a 'rhetorical question.'"

While we agree rhetorical hyperbole is not actionable, a rhetorical question is not the same as rhetorical hyperbole. A "rhetorical question" is defined as "a question not intended to elicit an answer but asked for rhetorical effect often with an assumption that only one answer is possible." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1946 (1981). "Rhetorical hyperbole" has been defined as "extravagant exaggeration [that is] employed for rhetorical effect." *Am. Broad. Cos. v. Gill*, 6 S.W.3d 19, 30 (Tex. App.—San Antonio 1999, pet. denied) (citing WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 592, 1011 (1988 ed.)). For example, the use of "rewarding," "ripping off," and "bilking" when reviewed in context have been considered rhetorical hyperbole. *Rehak*, 404 S.W.3d at 729.

The Post, however, as argued by Misko is a rhetorical question. Misko provided clear and specific evidence that many people read and understood Johns's "question" as a transparent accusation against her, as the Post was written in such a way that readers familiar with Misko knew she was the only possible person Johns had a "STRONG suspicion" of suffering from MSBP and allegedly abusing her daughter.

In reaching this conclusion, we are mindful of our holding in *Avila v. Larrea*, 394 S.W.3d 646, 659 (Tex. App.—Dallas 2012, pet. denied) in which we concluded the title of a broadcast posted on the internet, "Lawyer in Dallas Defrauding the Undocumented?" was phrased as a question, rather than an objectively verifiable fact, when the appellant did not explain, and the record did not show, how the title asserted an objectively verifiable fact. However, as previously stated, Misko provided clear and specific evidence that the Post asserted an objectively verifiable fact about her—whether she suffered from MSBP. Injuring a child or placing a child in imminent danger of injury constitutes a felony. *See* TEX. PENAL CODE ANN. 22.04 (West Supp. 2014). Mothers have been convicted of medical child abuse, which is also referred to as MSBP. *See Williamson v. State*, 356 S.W.3d 1 (Tex. App.—Houston [1st Dist.] 2010, pet. ref'd) (mother convicted of two first-degree felony offenses of injury to a child and sentenced to fifteen years' confinement for each offense, to run concurrently); *Austin v. State*, 222 S.W.3d 801 (Tex. App.—Houston [14th Dist.] 2007, pet. ref'd) (mother convicted of felony injury to a child and sentenced to ninety-nine years' incarceration). Further, a doctor such as Dr. V. Frank Cody, a psychiatrist and psychoanalysis who treated Misko for years, is capable of diagnosing and confirming whether Misko suffers from MBPS. He specifically denied that Misko suffered from the psychological disorder. As such, Misko established the Post, as written, was an accusation against her of child abuse due to MBPS, which is an objectively verifiable fact.

On the facts before us, we conclude Misko offered clear and specific evidence establishing a prima facie case of each element of her libel suit against Johns. Thus, the trial court correctly denied Johns's motion to dismiss under section 27.005(c). Having reached this conclusion, we need not address Misko's argument that Johns's motion to dismiss was waived because Johns failed to timely set the motion for hearing pursuant to section 27.004(a). TEX. CIV. PRAC. & REM. CODE ANN. § 27.004(a) ("A hearing on the motion under Section 27.003 must be set not later than the 60th day after the date of service of the motion . . .").

**Misko's Burden Under Section 27.005(c) as to Her Civil Conspiracy Claim Against Backes**

To avoid dismissal of her claim against Backes, Misko was required to bring forth clear and specific evidence establishing a prima facie case for each essential element of her civil conspiracy claim. TEX. CIV. PRAC. & REM. CODE ANN. § 27.005(c). Backes argues Misko failed to bring forth any evidence to support a meeting of the minds between Backes and Johns to create and publish the Post. Misko responds the overall context of the women's postings, which include "The Ramblings of a Crazy Bitch" photo, their attempts to find the picture of "the kid at the computer saying the bitch blocked me," and the "vitriol" against her on the deleted "Who to Breed To" thread show a conspiracy. Misko also relies on the "preemptive strike" post by Johns on Backes's Facebook wall. Backes replies any alleged agreement between her and Johns to publish insults on social media that occurred prior to the Post is not clear and specific evidence of a conspiracy to publish the Post. We agree.

The essential elements of a civil conspiracy are (1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as a proximate result. *Anderton v. Cawley*, 378 S.W.3d 38, 60 (Tex. App.—Dallas 2012, no pet.). The object to be accomplished must be either an unlawful purpose or a lawful purpose to be achieved by unlawful means. *Id*. A defendant's

liability for conspiracy depends on "participation in some underlying tort for which the plaintiff seeks to hold at least one of the named defendants liable." *Cotton v. Weatherford Bancshares*, 187 S.W.3d 687, 701 (Tex. App.—Fort Worth 2006, pet. denied). Recovery for civil conspiracy is not based on the conspiracy but on the underlying tort. *Tilton v. Marshall*, 925 S.W.2d 672, 681 (Tex. 1996) (orig. proceeding) (op. on reh'g). A civil conspiracy claim may be proved by circumstantial evidence and reasonable inferences from parties' actions. *In re Lipsky*, 411 S.W.3d 530, 549 (Tex. App.—Fort Worth 2013, orig. proceeding).

The crux of Misko's argument is that because of the various postings between Backes and Johns prior to the Post, many of which are mean-spirited, this Court should infer Backes and Johns agreed to create and publish the Post. Chapter 27 requires more than an inference that there was a meeting of the minds between the two women. Rather, it requires clear and specific evidence. *See KTRK Television, Inc.*, 409 S.W.3d at 689 (citing BLACK'S LAW DICTIONARY 268, 1167 (8th ed. 2004)) (defining "clear" as "unambiguous," and "specific" as "explicit" or "relating to a particular named thing"). The evidence relied on by Misko does not meet this threshold.

The "The Ramblings of a Crazy Bitch" photo with the words, "Did someone forget to put on their big girl panties?" and their attempts to find the picture of "the kid at the computer saying the bitch blocked me," is not evidence of a meeting of the minds between Johns and Backes to publish the Post. These pre-Post comments have nothing to do with Misko's daughter, her health, or MBPS; therefore, no such implication can be made about some meeting of the minds about an object to be accomplished, which is the Post.[4]

[4] Misko argues Backes and Johns have "miscast" her civil conspiracy claim as being a conspiracy to publish the Post; however, Misko claims theirs was a conspiracy to defame her, which was "furthered and accomplished by Johns' Munchausen post." Regardless of how Misko claims to have pleaded her conspiracy claim, she still has failed to bring forth clear and specific evidence supporting an essential element of the claim–a meeting of the minds between Johns and Backes to defame her.

The post on Backes's Facebook wall in which Johns asked, "Is it appropriate to do a preemptive strike?" was answered by Backes with a "No." Any leap by Misko that Backes must have accepted the proposal, despite her clear negation of it, is pure conjecture and speculation. Further, the record contains no clear and specific evidence about what Johns meant by "preemptive strike."

Accordingly, we conclude Misko did not establish through clear and specific evidence a prima facie case that Johns and Backes agreed to defame her; therefore, Misko failed to carry her burden under section 27.005(c).

In reaching this conclusion, we reject Misko's spoliation argument. Misko contends Backes's deletion of posts on the "Who to Breed To" Delphi Forum gives rise to a presumption the deleted posts supported Misko's conspiracy claim against Backes. We do not agree.

A party who establishes that spoliation has occurred may be entitled to a presumption that the destroyed evidence would not have been favorable to the destroyer. *Rico v. L-3 Commc'ns Corp.*, 420 S.W.3d 431, 437 (Tex. App.—Dallas 2014, no pet.). Such a presumption is appropriate when a party has deliberately destroyed evidence or has failed to either produce or explain the evidence's nonproduction. *Id*. In determining whether a spoliation presumption is justified, a trial court considers whether (1) there was a duty to preserve the evidence; (2) the alleged spoliator breached this duty; and (3) the spoliation prejudiced the non-spoliator's ability to present its case or defense. *Id*. Assuming without deciding that Backes had a duty to preserve the postings and breached the duty, we consider whether the deleted posts prejudiced her ability to present her conspiracy claim.

The affidavits submitted by White and Redding stated Johns and Backes were aggressively attacking Misko personally and challenging the integrity of her horse breeding program on the deleted thread. The thread also discussed whether Backes's stallion tested

positive for HERDA. White and Mahon testified Backes called Misko "bat shit crazy" on the deleted thread.

Misko herself testified she recalled some of the content of the deleted thread, which related to Backes's admission a stallion tested HERDA positive, which was inconsistent with a prior statement. Misko stated Backes and Johns began personally attacking her mental status and her horse breeding program. She "observed the close timing and quantity of these postings against me on the deleted thread and that they described me as being unstable and with Backes stating that one of my mares might be HERDA positive."

Having considered this evidence, we conclude Misko's ability to present her conspiracy to commit libel claim has not been prejudiced by any destruction of evidence. No one testified Johns and Backes agreed to write and publish the Post. Further, no one testified Misko's daughter or her health were discussed in the deleted thread. Rather, the evidence shows the deleted thread discussed genetic horse testing and personal attacks against Misko. It did not discuss or mention MSBP. Accordingly, Misko has provided no evidence from which the trial court could conclude she was prejudiced in her ability to present her case such that she may be entitled to a spoliation presumption. *Rico*, 420 S.W.3d at 437 (stating party who establishes spoliation has occurred may be entitled to a presumption that the destroyed evidence would not have been favorable to the destroyer).

Because Misko failed to carry her burden under section 27.005(c), the trial court erred by denying Backes's motion to dismiss. We reverse the trial court's judgment and render judgment dismissing Misko's counterclaim against Backes for civil conspiracy to defame Misko.

## Conclusion

We affirm the trial court's order denying Johns's motion to dismiss. We reverse the trial court's order denying Backes's motion to dismiss and render judgment dismissing Misko's

counterclaim against her. We remand Backes's case to the trial court for a determination of costs, attorney's fees and other expenses as authorized under section 27.009(a). *See* TEX. CIV. PRAC. & REM. CODE ANN. § 27.009(a).

140566F.P05

/David L. Bridges/
DAVID L. BRIDGES
JUSTICE




# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

JANE MCCURLEY BACKES D/B/A BACKES QUARTER HORSES AND TRACY JOHNS, Appellants

No. 05-14-00566-CV V.

KAREN MISKO AND MISKO QUARTER HORSES, LLC, Appellees

On Appeal from the 429th Judicial District Court, Collin County, Texas
Trial Court Cause No. 429-01844-2013.
Opinion delivered by Justice Bridges.
Justices Lang and Evans participating.

In accordance with this Court's opinion of this date, we **AFFIRM** the trial court's order denying appellant Tracy Johns's motion to dismiss.

We **REVERSE** the trial court's order denying appellant Jane McCurley Backes d/b/a/ Backes Quarter Horses and **RENDER** judgment dismissing appellees' Karen Misko and Misko Quarter Horses, LLC's civil conspiracy counterclaim against appellant Jane McCurley Backes d/b/a/ Backes Quarter Horses. We **REMAND** appellant Jane McCurley Backes d/b/a/ Backes Quarter Horses's case back to the trial court for a determination of costs, attorney's fees and other expenses as authorized under TEX. CIV. PRAC. & REM. CODE ANN. § 27.009(a).

It is **ORDERED** that Jane McCurley Backes d/b/a/ Backes Quarter Horses recover her cost of this appeal from Karen Misko and Misko Quarter Horses, LLC.

It is **ORDERED** that Karen Misko and Misko Quarter Horses, LLC recover their cost of this appeal from Tracy Johns.

Judgment entered March 13, 2015.