**Affirmed in part, Reversed in part, and Opinion filed October 22, 2019.**



**In the**

# Fourteenth Court of Appeals

## NO. 14-17-00883-CV

## CHARLES LEE CUNNINGHAM III AND KARAN LOZANO, Appellants

### v.

## CHRISTI LEE WAYMIRE, AND GARY MICHAEL WAYMIRE, INDIVIDUALLY AND AS NEXT FRIEND OF MINOR CHILDREN MC AND MC2, Appellees

**On Appeal from the 234th District Court**
**Harris County, Texas**
**Trial Court Cause No. 2017-38751**

## OPINION

When appellant Charles Lee Cunningham III became upset that his daughter, appellee Christi Lee Waymire, was seeking psychiatric therapy for her son Max[1] (Cunningham's grandson), he demanded that she stop her son's therapy and

---

[1] To protect the minors' identities, we use pseudonyms rather than the actual names of the children.

threatened to send letters to the Department of Family and Protective Services ("CPS")[2] suggesting that Christi[3] and her husband, appellee Gary Michael Waymire, were using drugs and that Gary (Max's stepfather) had molested Max. When Christi did not do as Cunningham demanded, he and his sister, appellant Karan Lozano, called in reports to CPS.

To address these actions, the Waymires filed suit against Cunningham and Lozano for alleged libel, intentional infliction of emotional distress, negligence, and conspiracy. In response, Cunningham and Lozano filed a motion to dismiss the Waymires' lawsuit under the Texas Citizens' Participation Act ("TCPA"). *See* Act of May 21, 2011, 82nd Leg., R.S., ch. 341, §§ 1–2, 2011 Tex. Gen. Laws 961, 961–64, *amended by* Act of May 24, 2013, 83rd Leg., R.S., ch. 1042, §§ 1–3, 5, 2013 Tex. Gen. Laws 2499, 2499–2500 (amended 2019) (current version at Tex. Civ. Prac. & Rem. Code Ann. §§ 27.001–.011)).

This is an interlocutory appeal from the trial court's order denying the motion. Cunningham and Lozano contend the trial court erred in denying the motion in three issues: (1) the TCPA applies to the lawsuit filed by the Waymires because the Waymires' claims were based on, related to, or in response to, the exercise of the right of free speech or the right to petition; (2) the Waymires cannot meet their burden under the TCPA to establish by clear and specific evidence a prima facie case on their claims; and (3) Cunningham and Lozano have proven each essential element of affirmative defenses to the Waymires' claims.

---

[2] Although the Texas agency tasked with protecting abused and neglected children is properly referred to as the Department of Family and Protective Services, the parties refer to the agency as Child Protective Services or CPS. CPS is one of many functions of the Department. *See, e.g.*, Tex. Hum. Res. Code Ann. §§ 40.0505, .05275. For convenience and consistency, in this opinion we use the acronym CPS to refer to the Department.

[3] Because Christi and her husband Gary share the same surname, we refer to them individually by their first names to avoid confusion.

Because we conclude the lawsuit filed by the Waymires is based on, relates to, or is in response to, the exercise of the right of free speech, we sustain Cunningham's and Lozano's first issue. We sustain in part, and overrule in part, Cunningham's and Lozano's second issue because we conclude that the Waymires met their burden with respect to some but not all of their claims. We overrule Cunningham's and Lozano's third issue because the affirmative defenses asserted by Cunningham and Lozano do not foreclose the libel claims for which the Waymires established a prima face case.[4]

We affirm in part, and reverse in part, the order of the trial court.

## I. BACKGROUND[5]

The Waymires have three children together in a blended family, Max, Josh, and Henry.[6] Max and Henry are Christi's biological sons and Gary's stepsons. Josh is Gary's biological son and Christi's stepson. Gary acts as a father to all three boys; he picks them up from school, accompanies them to their extracurricular activities, cooks for them, and provides for them.

Cunningham is Christi's father, Max's grandfather, and Gary's father-in-law. Lozano is Cunningham's sister, Christi's aunt, and Max's great-aunt. Before the events at issue in this lawsuit occurred, Christi and Cunningham had a close

---

[4] *See* Tex. R. App. P. 47.1.

[5] In determining whether a lawsuit should be dismissed under the TCPA, "the court shall consider the pleadings and supporting and opposing affidavits stating the facts on which the liability or defense is based." TCPA § 27.006(a). We consider the pleadings, as well as supporting and opposing affidavits. Because we need not look further than the pleadings to conclude the TCPA applies, and because the "prima facie case" standard we must apply refers to evidence sufficient as a matter of law to establish a given fact if it is not rebutted or contradicted, *In re Lipsky*, 460 S.W.3d 579, 590 (Tex. 2015) (orig. proceeding), the factual background stated herein is primarily based on facts stated in the affidavits of Christi and Gary Waymire.

[6] *See supra* note 1.

relationship. However, Cunningham never approved of Christi's decision to marry Gary.

Cunningham had a close relationship with Max, and despite Cunningham's attitude toward Gary, Christi tried to maintain that relationship. However, Cunningham resented Gary's involvement with his grandchildren, asking Christi, "who does [Gary] think he is[,] playing dad?" Once, when Max was grounded from the Internet because Max had created a secret email account, Cunningham grew angry after Gary asked Christi to remind Cunningham not to allow Max on the Internet. Cunningham yelled, "He is not [Max]'s dad. I am. He can't tell me what to do." One evening in 2015, after Gary cooked dinner for the family, Cunningham told Gary, "[M]ark my words; I will do whatever it takes to get those children out of [your] house."

In January 2017, the Waymires started receiving negative reports from Max's school about his behavior. Max had been well-behaved in the past, but now he was bullying other children, and he would not stop after being reprimanded. At home, Max became aggressive towards his brothers and kicked one of them in the head. Max developed problems with impulse control and would get upset and depressed easily. Christi was deeply troubled about Max's behavior because Max's biological father suffered from severe bipolar disorder, and Christi was aware that bipolar disorder can be hereditary. After Max was suspended from school twice, the Waymires sought professional help.

The Waymires took Max to a therapist. The therapist suggested a full psychiatric evaluation of Max. The Waymires sought to have the evaluation performed by a doctor, and the doctor recommended Max be admitted for a six-day inpatient treatment and diagnosis. During Max's six-day hospital stay, the doctor diagnosed him with disruptive mood dysregulation disorder, a childhood and

4

adolescent ailment causing persistent irritability, angry moods, and temper outbursts. The doctor prescribed medication and recommended continued counseling with the therapist and a psychiatrist.

Because of Max's close relationship with his grandfather, Christi informed Cunningham of Max's symptoms and the actions she was taking to help him. Initially, Cunningham seemed supportive, although he said he did not believe in psychiatric therapy, which he said was for "crazy people." Over time, however, Cunningham's attitude towards Max's therapy deteriorated. Cunningham told Christi, "anything wrong with Max is a direct result of [your] bad parenting" or "a direct result of [you] being married to a loser," and "[you] are the crazy one, not Max." Then Cunningham began to blame Max's psychiatric problems on Gary. Cunningham would repeatedly tell Christi that Gary was "brainwashing" her and that having Max committed was Gary's "first step at getting rid of" Christi's children.

At one point, during a therapy session, Cunningham called Christi to try to persuade her to bring Max to him that same afternoon. When Christi would not agree to do so, Cunningham became so loud and angry that the therapist could hear him. The therapist suggested that Christi keep Max away from anyone who would not be supportive. Later that afternoon, Cunningham called Christi and told her that if she did not stop Max's therapy, he would use "any means necessary" to ensure Christi lost custody of the children. He said, "you would lose your whole family."

Christi's mother is no longer married to Cunningham and lives in a separate residence. Not long after Cunningham made his threatening calls to Christi, the Waymires took their children to Christi's mother's house for the day because the children had a day off from school and the Waymires had to work. Christi's mother called her at work to say Cunningham had shown up, had taken Max to his truck,

and was talking to him. Christi instructed her mother to get Max away from Cunningham and bring the children back to Christi. When Max was returned to Christi, he appeared confused and worried. Max wanted to know why his grandfather was asking him questions about Gary touching him in a way that made him feel uncomfortable or in the shower and whether the Waymires were using drugs. Max said his grandfather would not tell him what was going on but kept talking about Gary touching him in the shower. Christi believed Cunningham was suggesting to Max, or coaching Max to say, he was sexually molested by Gary.

That same day, Cunningham initiated a text exchange, asking if he was "getting [Max] for the weekend," apologizing that he "got so mad," and instructing Christi to come by his house because he "had a lot to say" to her. Christi expressed frustration that her father had "go[ne] behind [her] back to talk to [Max] right now with everything going on." Christi emphasized that Cunningham's opinions, threats, and accusations were wrong. Christi stated that she would not talk to Cunningham until he was "150% on board with the treatment plan set in place by [Max's] parents and his doctors." Cunningham told Christi to come by his house so they could "fix this." He said, "It's not only the doctor thing that's a problem. <u>I'm trying to help you an[d] you don't see it. Hate to see you [lose] your entire family</u> when we all love you so much" (underlining in original). Christi refused, saying, "[t]he only help I need is support while we figure out what is going on with [Max]." Christi further stated, "I will NOT take the risk of him being exposed to anyone's insanity—which is exactly what you've been throwing at me since last Friday—insanity." Then Cunningham and Christi exchanged the following texts:

| Cunningham: | <u>I think you['re] brainwashed by your husband an[d] don't know what you['re] doing.</u> |
| | To protect your husband over your child. Really hope CPS doesn't think your [sic] covering for him. |

|             | I will send you the letters myself an[d Lozano] are sending to CPS so y'all can try to get your story straight. . . . |
|-------------|---------------------------------------------------------------------------------------------------------------------------|
| Christi:    | If you put [Gary's] son at risk by even attempting to contact his mother, he will go to war. If you call CPS[,] I will get a restraining order. |
| Cunningham: | Lol[.] He screw[ed] you up and that's screwing with me. He loses[.] |

(underlining in original).

Then Cunningham texted Christi copies of letters he planned to send from himself and Lozano to CPS. Both letters stated Christi had told Lozano that Max had accused Gary of doing something that was "so bad that [Gary] would lose custody of his child." Cunningham's letter said that as part of a conversation about inappropriate touching, Max asked, "Is it okay even if it's in the shower?" Both letters suggested that the Waymires admitted Max for inpatient therapy and diagnosis in the hospital to discredit Max and provide cover for Gary. According to Christi, she did not have the referenced conversation with her aunt. Gary's affidavit states he never molested anyone. The question about the shower was taken out of context; it was part of a larger conversation initiated by Max's grandmother about keeping private parts private. Moreover, although Cunningham knew that neither Christi nor Gary did drugs or consumed alcohol, both letters expressed concern over drug abuse and stated that both Christi and Gary had a history of drug abuse and Christi appeared extremely thin and unhealthy.[7]

Christi responded, "None of you will ever see any of my children again."

Cunningham replied, "An[d] that makes you a horrible mom. Hope th[eir]

---

[7] Christi later learned that Lozano also told CPS that the Waymires manufactured a drug called "DMT," probably a reference to dimethyltryptamine (a hallucinogen), in their home. Christi attests this was not true.

dads don't get wind of this because you won't see them either. Don't push me honey[.]"

The following days were emotionally draining for the Waymires. Christi cried, and felt shock and alarm. Gary appeared pale and sick. The Waymires were unable to eat or sleep. Not knowing what to do, they went to the police department and filed a report. The officer they spoke to said although he did not believe Max had been abused, he could not stop Cunningham from filing his report. The Waymires hired a lawyer, and the lawyer sent letters to Cunningham and Lozano demanding they withdraw their letters and false allegations.

Cunningham and Lozano contacted CPS. At the request of CPS, Cunningham and Lozano gave oral statements to CPS, rather than sending the prepared letters. The information Cunningham and Lozano orally provided to CPS was similar to, or the same as, the information included in their prepared letters.

Afterwards, the Waymires learned that their sons had been interviewed by CPS at summer camp. Max called Christi crying after his interview and asked her to come pick him up from camp. Christi left work immediately. When Christi arrived at the camp, the caseworker asked to interview her. Christi agreed. The caseworker informed Christi that the Waymires were being investigated due to allegations of drug use, drug manufacturing, child abuse, and neglect. Christi felt panic. Max asked if he was going to be taken away and why his grandfather was doing this. Josh became hysterical and cried, asking, "Is she going to take us to an orphanage? Please don't let her take us away from you." Seeing the children in this state brought Christi to tears.

As the investigation progressed, CPS interviewed both Christi and Gary and inspected their home. CPS also interviewed several other individuals regarding the Waymires' fitness as parents. CPS requested and obtained drug tests from both

Christi and Gary. The drug tests did not show any drug use. At the end of the investigation, CPS concluded that, based on the available information, it was reasonable to conclude that the alleged abuse or neglect did not occur.

The Waymires later discovered that, in addition to contacting CPS, Cunningham had emailed Gary's ex-wife's lawyer, asking the lawyer to give Gary's ex-wife his contact information and stating, "I have info that would help her get her child[, Josh] . . . . Should you decline to notify her[,] please e-mail me back so I can look for her elsewhere." In his deposition, Cunningham admitted that, because he did not know how to find the ex-wife, he parked down the street from the Waymires' house, waited for the ex-wife to pick up her child from the Waymires' house, followed her to a grocery store, followed her inside the grocery store, and then "stopped her and introduced [him]self and told her what happened." Cunningham told her, "I want you to be aware of something because it's your child[, Josh], that my daughter had told my sister about the accusation of something happening between [Max] and Gary . . . and I think you need to be aware of it and keep your eyes open."

Cunningham later admitted in his deposition that he had "no idea" what happened. Cunningham testified, "I don't know what happened in that home, no, I don't." In her deposition, Lozano maintained that Christi told her about an alleged bad incident but admitted that she did not ask Christi what happened, and that although Christi allegedly mentioned the bad incident in April, Lozano did not prepare her letter to CPS until June. Lozano further admitted she has "no knowledge" about whether Max was sexually abused.

Christi and Gary—in their individual capacities and as next friends of Max and Josh—sued Cunningham and Lozano for libel, intentional infliction of emotional distress, negligence, and conspiracy. The Waymires' petition lists the

9

allegations upon which these claims are based:

- Cunningham threatened Christi that he would take away her son (Max);

- Cunningham told Max in person that Cunningham was going to take Max from Christi and Gary;

- Cunningham drafted a letter he proposed to send to CPS which contained outrageous, false, disparaging, and hurtful allegations of sexual abuse and drug abuse against Christi and Gary and sent it to Christi and Gary in a menacing display of intent to destroy their character;

- Cunningham threatened to send the letter he had drafted to CPS if Christi and Gary continued Max's treatment for mental-health issues;

- Cunningham sent a false and disparaging report alleging criminal acts by Christi and Gary to CPS, which prompted CPS investigators to interview Max about Christi and Gary using drugs in front of him;

- Lozano drafted a letter she proposed to send to CPS that contained outrageous, false, disparaging, and hurtful allegations that Christi and Gary regularly used illegal drugs in the presence of Max at their home;

- Lozano sent the letter she had drafted to CPS, which prompted CPS investigators to interview Max about Christi and Gary using drugs in front of him;

- Cunningham and Lozano, without justification, caused CPS to investigate the Waymires' home and interview Max about drug use and sexual abuse; and

- Cunningham's and Lozano's conduct caused severe emotional distress.

In response to the lawsuit, Cunningham and Lozano filed a motion to dismiss the lawsuit under the TCPA.[8] Cunningham and Lozano argued that the TCPA applied because the lawsuit is based on, relates to, or is in response to their exercise of the right to free speech and the right to petition. Cunningham and Lozano argued they could prove affirmative defenses to the Waymires' claims by a preponderance

---

[8] Cunningham initially filed a motion to dismiss and a first amended motion to dismiss before filing a joint motion to dismiss with Lozano and setting a hearing on the motion for fewer than three business days later.

of the evidence. Cunningham and Lozano submitted affidavits in support of their motion. Cunningham and Lozano also sought over $50,000 in attorney's fees and sanctions of $50,000 each for Cunningham and Lozano. The Waymires responded to the motion,[9] arguing that (1) the TCPA did not apply, (2) they established a prima facie case of their claims (satisfying their burden under the TCPA), and (3) Cunningham and Lozano failed to carry their burden to prove their affirmative defenses. The Waymires attached affidavits, as well as deposition transcripts, in support of their response. After a hearing, the trial court denied the motion. Cunningham and Lozano appealed.

## II. ANALYSIS

### A. TCPA framework and standard of review[10]

The TCPA protects citizens from retaliatory lawsuits that seek to silence or intimidate them on matters of public concern. *In re Lipsky*, 460 S.W.3d 579, 584 (Tex. 2015) (orig. proceeding); *see generally* TCPA §§ 27.001–.011. The statute is an anti-SLAPP law, with "SLAPP" being the acronym for "Strategic Lawsuit Against Public Participation." *See Fawcett v. Grosu*, 498 S.W.3d 650, 654 (Tex. App.—Houston [14th Dist.] 2016, pet. denied). The purpose of the statute is to identify and summarily dispose of lawsuits designed to chill First Amendment rights. *In re Lipsky*, 460 S.W.3d at 589; *see also* TCPA § 27.002. The TCPA is broadly worded, and as a result, it has been very broadly applied. *Long Canyon Phase II & III Homeowners Assoc., Inc. v. Cashion*, 517 S.W.3d 212, 216–17 (Tex. App.—

---

[9] The Waymires filed responses to Cunningham's initial motion and amended motions before filing a supplemental response on the morning of the hearing in response to Cunningham's and Lozano's joint motion.

[10] Since this lawsuit began, the TCPA has been amended. The amendments went into effect on September 1, 2019. As the amended version does not apply to this case, we provide no analysis or interpretation of the amended version here.

Austin 2017, no pet.).

The TCPA provides a two-step process to expedite the dismissal of a "legal action"[11] that is "based on, relates to, or is in response to a party's exercise of the right of free speech, right to petition, or right of association." TCPA § 27.003(a). First, the movant seeking dismissal under the TCPA must "show[] by a preponderance of the evidence that the [nonmovant's] legal action is based on, relates to, or is in response to the [movant]'s exercise of: (1) the right of free speech; (2) the right to petition; or (3) the right of association." TCPA § 27.005(b). Second, if the movant makes that showing, the burden shifts to the nonmovant to "establish[] by clear and specific evidence a prima facie case for each essential element of the claim in question" to avoid dismissal. TCPA § 27.005(c). If the nonmovant meets that burden and the "legal action" otherwise would survive, the TCPA allows the movant to obtain dismissal by "establish[ing] by a preponderance of the evidence each essential element of a valid defense to the nonmovant's claim." TCPA § 27.005(d).

The evidence the trial court "shall consider" in "determining whether a legal action should be dismissed" under the TCPA expressly includes "the pleadings and supporting and opposing affidavits stating the facts on which the liability or defense is based." TCPA § 27.006(a). We review de novo whether claims are covered by the TCPA. *Fawcett*, 498 S.W.3d at 656.

## B.     Application of the TCPA

In their first issue, Cunningham and Lozano contend the TCPA applies to the Waymires' suit because the suit is based on, relates to, or is in response to Cunningham's and Lozano's exercise of the rights of free speech.

---

[11] The Waymires concede their lawsuit is a legal action, as defined by the TCPA.

The TCPA defines the right of free speech as involving communications. TCPA § 27.001(3). "Exercise of the right to free speech" is "a communication made in connection with a matter of public concern." TCPA § 27.001(3). A "'[m]atter of public concern' includes an issue related to: (A) health or safety; (B) environmental, economic, or community well-being; (C) the government; (D) a public official or public figure; or (E) a good, product, or service in the marketplace." TCPA § 27.001(7). "The TCPA does not require that the statements specifically 'mention'" any of the listed matters of public concern, "nor does it require more than a 'tangential relationship'" to same; rather, the TCPA applies so long as the defendant's statements are "in connection with" "issue[s] related to" any of the matters of public concern listed in the statute. *ExxonMobil Pipeline Co. v. Coleman*, 512 S.W.3d 895, 900 (Tex. 2017) (per curiam) (quoting TCPA § 27.001(3), (7)). The TCPA also broadly defines "communication" as "includ[ing] the making or submitting of a statement or document in any form or medium, including oral, visual, written, audiovisual, or electronic." TCPA § 27.001(1).

Cunningham and Lozano argue that their communications regarding the alleged abuse of Max were "related to" matters of public concern—"health or safety" and "community well-being." They cite *Backes v. Misko* for the proposition that a statement about a parent's mental health and a child's possible abuse satisfies the definition of "matter of public concern." 486 S.W.3d 7, 18 (Tex. App.—Dallas 2015, pet. denied). *Backes* involved a dispute between horse breeders on a social-media forum. *Id.* at 12–16. One horse breeder stated she suspected that another horse breeder suffered from Munchausen syndrome by proxy, "indicat[ing] a child was suffering abuse from a parent." *Id.* at 18. The court concluded that this statement "not only involved a matter of someone's health, but also a child's safety," and therefore it fell within the TCPA's definition of "matter of public concern." *Id.*

13

The Waymires respond that *Backes* is inapposite, as the communications at issue in *Backes* took place on a social-media forum that was "frequently visited by others." The Waymires contend the communications of Cunningham and Lozano did not concern matters of public concern because, by contrast, the reports to CPS were confidential and not subject to public disclosure. In support of their argument that private communications do not constitute matters of public concern, the Waymires cite *Snyder v. Phelps*, 562 U.S. 443 (2011); *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749 (1985); and *Time, Inc. v. Firestone*, 424 U.S. 448 (1976). This Supreme Court jurisprudence analyzes "public concern" or "public controversy" as the terms are used in applying legal standards under the First Amendment. *See Snyder*, 562 U.S. at 451–58; *Dun & Bradstreet*, 472 U.S. at 758–62; and *Time*, 424 U.S. at 454–55. But we apply the plain text of the TCPA rather than First Amendment jurisprudence to determine whether the TCPA applies. *See Coleman*, 512 S.W.3d at 901.

The Waymires also cite *Miranda v. Byles*, but that case did not involve the TCPA either. 390 S.W.3d 543 (Tex. App.—Houston [1st Dist.] 2012, pet. denied). The court in *Miranda* concluded an issue was private, not public, for purposes of determining the burden of proof in a defamation claim. *Id.* at 554.

The only case the Waymires cite which did involve the TCPA is *Pickens v. Cordia*, 433 S.W.3d 179 (Tex. App.—Dallas 2014, no pet.). Since *Pickens*, however, the Supreme Court of Texas has held that the TCPA's plain language "limits its scope to communications involving a public subject—not communications in public form." *Lippincott v. Whisenhut*, 462 S.W.3d 507, 508 (Tex. 2015) (per curiam).

Recent supreme court precedent applies the TCPA very broadly. Private communications on "matters of public concern" are covered by the TCPA. *See Coleman*, 512 S.W.3d at 901; *Lippincott*, 462 S.W.3d at 509. The Waymires' lawsuit

14

is based on, relates to, or is in response to Cunningham's and Lozano's communications regarding an issue related to health, safety, or community well-being. *See Backes*, 486 S.W.3d at 18. The Waymires' claims thus relate to the exercise of the right to free speech, as broadly defined by the TCPA and interpreted by the supreme court. *See, e.g.*, *Coleman*, 512 S.W.3d at 901. Therefore, the TCPA applies. To the extent the trial court's denial was based on a conclusion that the TCPA did not apply, the trial court erred. We sustain Cunningham's and Lozano's first issue.[12]

## C. Prima facie case

In their second issue, Cunningham and Lozano argue the Waymires cannot meet their burden under the TCPA to establish by clear and specific evidence a prima facie case on their claims.

If the movants on a TCPA motion show that the TCPA applies, the burden shifts to the nonmovants to "establish[ ] by clear and specific evidence a prima facie case for each essential element of the claim in question" to avoid dismissal. TCPA § 27.005(c). The supreme court has noted that "[c]lear and specific evidence is not a recognized evidentiary standard[,]" and "[a]lthough it sounds similar to clear and convincing evidence, the phrases are not legally synonymous." *In re Lipsky*, 460 S.W.3d at 589. In addition, the supreme court noted that the term "prima facie case" "refers to evidence sufficient as a matter of law to establish a given fact if it is not rebutted or contradicted." *Id.* at 590.

Under the TCPA, general allegations that merely recite the elements of a claim

---

[12] Cunningham and Lozano also argue the TCPA applies to the Waymires' suit because the suit is based on, relates to, or is in response to Cunningham's and Lozano's exercise of the right to petition. Because the TCPA applies in connection with the exercise of the right of free speech, we do not determine whether the Waymires' lawsuit is based on, related to, or in response to Cunningham's and Lozano's exercise of the right to petition. *See* Tex. R. App. P. 47.1.

will not suffice; rather, "a plaintiff must provide enough detail to show the factual basis for its claim." *Id.* at 590–91. Although the TCPA "initially demands more information about the underlying claim, the Act does not impose an elevated evidentiary standard or categorically reject circumstantial evidence." *Id.* at 591.

Cunningham and Lozano argue that the Waymires did not establish a prima facie case with respect to any of their claims.

## 1. Libel

Cunningham and Lozano argue that the Waymires cannot establish a prima facie case of libel because they have no evidence that (a) the allegedly libelous statements were published to a third party or (b) Cunningham or Lozano made an "objectively verifiable false statement of fact," as required to prove libel.

### a. Publication

Publication of a false statement of fact to a third party is a threshold requirement for proving defamation. *Dallas Morning News, Inc. v. Tatum*, 554 S.W.3d 614, 623 (Tex. 2018) (citing *Exxon Mobil Corp. v. Rincones*, 520 S.W.3d 572, 579 (Tex. 2017)); State Bar of Tex., Texas Pattern Jury Charges—Business, Consumer, Insurance & Employment PJC 110.2 cmt. (2018). Defamation may occur through slander or through libel. *Dallas Morning News*, 554 S.W.3d at 623. Slander is a defamatory statement expressed orally. *Id.* By contrast, libel is a defamatory statement expressed in written or other graphic form. *See* Tex. Civ. Prac. & Rem. Code Ann. § 73.001; *Dallas Morning News*, 554 S.W.3d at 623. Because the Waymires alleged libel, not slander, to show a prima facie case of libel, they must present clear and specific evidence that defamatory statements were published to a third party in written or graphic form. *See* TCPA § 27.005(c); *Dallas Morning News*, 554 S.W.3d at 623.

16

The Waymires assert they have established clear and specific evidence on this element because Cunningham's and Lozano's allegations about Gary were published to Christi, and Lozano's statements about both of the Waymires were published to Cunningham. The Waymires also argue that the allegedly libelous statements were published when they were orally reported to CPS. The Waymires argue in the alternative that they made a prima facie showing of a slander claim, which was tried by consent. We address each of these arguments in turn.

*Publication to other parties in the suit*

Generally, a statement is not published to a third person if it is published only to the plaintiff. *See Rincones*, 520 S.W.3d at 579 (citing Restatement (Second) of Torts § 577 cmt. m (1977)). Cunningham and Lozano assert that because Christi is a plaintiff, publication of statements about Gary to Christi does not satisfy the requirement of publication to a third party. Similarly, Cunningham and Lozano assert that Lozano's publication of statements about Christi and Gary to Cunningham does not satisfy the requirement of publication to a third party because both Lozano and Cunningham are defendants. We disagree.

Cunningham and Lozano have cited no controlling authority, and we have found none, supporting their arguments that publications to a co-plaintiff or co-defendant do not satisfy the "third party" publication requirement. Most of the cases Cunningham and Lozano cite for this proposition do not involve a plaintiff asserting defamation based on publication to a co-plaintiff or co-defendant. *See id.* at 581 (declining to recognize cause of action for compelled self-defamation); *Thomas–Smith v. Mackin*, 238 S.W.3d 503, 508 (Tex. App.—Houston [14th Dist.] 2007, no pet.) (publication to two individuals not party to lawsuit); *Glenn v. Gidel*, 496 S.W.2d 692, 697–98 (Tex. App.—Amarillo 1973, no writ) (defamatory statement published only to plaintiff). In *Baubles & Beads v. Louis Vuitton, S.A.*, the court did

17

hold there was no publication to support slander claims made by a business and its employee when evidence showed the statement at issue was made solely in the presence of the employee, but the court came to this conclusion after holding that the issue was waived and without any discussion of whether publication to the employee could support a slander claim by the business. 766 S.W.2d 377, 380 (Tex. App.—Texarkana 1989, no writ). Moreover, we are not bound by this decision of a sister court of appeals. *See Chrismon v. Brown*, 246 S.W.3d 102, 111 n.8 (Tex. App.—Houston [14th Dist.] 2007, no pet.).

Alignment of parties does not typically bar one party from a legal claim or substantively impact a party's ability to recover. In our view, with regard to Gary's claim for libel against Cunningham, Christi is a third party. Cunningham (first party) sent alleged libelous statements about Gary (second party) to Christi (third party). Similarly, with regard to Christi's and Gary's libel claims against Lozano, Cunningham is a third party. Lozano (first party) sent alleged libelous statements about Christi and Gary (second parties) to Cunningham (third party). Therefore, we conclude that the third-party publication requirement was met for (1) Gary's libel claims against Cunningham and Lozano and (2) Christi's libel claims against Lozano. Because this does not include Christi's libel claim against Cunningham, we proceed to determine whether the oral reports to CPS met the publication requirement of libel.

*Oral report to CPS*

Generally, libel must be expressed in written or graphic form. Tex. Civ. Prac. & Rem. Code Ann. § 73.001 ("A libel is a defamation expressed in written or other graphic form . . . ."). Texas case law provides, however, that "[t]he broadcast of defamatory statements read from a script is libel, not slander." *Neely v. Wilson*, 418 S.W.3d 52, 60 (Tex. 2013) (citing *Christy v. Stauffer Publ'ns, Inc.*, 437 S.W.2d 814,

18

815 (Tex. 1969)).

The Waymires argue that Cunningham's and Lozano's defamatory letters to CPS were published because "they were essentially the broadcasting of defamatory statements read from a script." Texas cases that state the broadcast of statements read from a script constitutes libel have all involved broadcasts by media and news outlets. *See, e.g.*, *Neely*, 418 S.W.3d at 60; *Christy*, 437 S.W.2d at 815; *Dolcefino v. Randolph*, 19 S.W.3d 906, 917 (Tex. App.—Houston [14th Dist.] 2000, pet. denied).[13] Even assuming Cunningham and Lozano read their letters verbatim to CPS, such readings cannot be fairly characterized as broadcasts, and this case does not involve media or news outlets.

The Waymires also cite *Myre v. State* as a case in which the reading of a libelous document supported a finding that the statement was published. 70 S.W.2d 428 (Tex. Crim. App. 1934). Myre was convicted of criminal libel after he exhibited an affidavit to others and caused it to be read in the presence of other people. *Id.* at 428. The affidavit was from a woman who said the prosecuting witness on two occasions took her to a hotel room and had carnal knowledge of her, thus bringing the witness into contempt among honorable persons. *Id.* at 428–29. Although Myre did not create the affidavit, he did "circulate" it, which is part of the underlying criminal libel statutes.[14] The *Myre* case addressed libel as a criminal offense, not a

---

[13] We note that other jurisdictions have more broadly treated the oral reading of a written defamatory statement as libel rather than slander. *See, e.g.*, *Bander v. Metro. Life Ins. Co.*, 47 N.E.2d 595, 602 (Mass. 1943); *Ohio Public Serv. Co. v. Myers*, 6 N.E.2d 29, 32 (Ohio Ct. App. 1934). The *Restatement (Second) of Torts* also states that reading aloud a defamatory writing may constitute publication of libel. Restatement (Second) of Torts § 568 cmt. e (1977). Although Texas courts have relied upon section 568 for other propositions of law, none has held that reading aloud a defamatory writing constitutes libel outside of broadcast news or media. *See, e.g.*, *Cain v. Hearst Corp.*, 878 S.W.2d 577, 580 (Tex. 1994) (recognition of slander as spoken form of defamation in common law).

[14] Former provisions of the 1925 Penal Code provided:

civil claim, and it is not applicable to this appeal.

The statutory definition of civil libel since 1901 has defined libel as defamation expressed in written or graphic form.[15] The civil statute was never

---

Art. 1269. . . . **"Libel".**—He is guilty of "libel" who, with intent to injure, makes, writes, prints, publishes, sells, or circulates any malicious statement affecting the reputation of another in respect to any matter or thing pointed out in this chapter.

Art. 1274. . . . . **"Circulating".**—He is guilty of circulating a libel who, knowing its contents, either sells, distributes or gives, or who, with malicious design, reads or exhibits it to others.

Art. 1275. . . . . **The idea the statement must convey.**—The written, printed or published statement, to come within the definition of libel, must convey the idea . . . :

. . .

2. That he has been guilty of some act or omission which, though not a penal offense, is disgraceful to him as a member of society, and the natural consequences of which is to bring him into contempt among honorable persons . . . .

Art. 1276. . . . . **Mode of publication.**—A libel may be either written, printed, engraved, etched, or painted, but no verbal defamation comes within the meaning thereof; and whenever a defendant is accused of libel by means of a painting, engraving, or caricature, it must clearly appear therefrom that the person said to be defamed was, in fact, intended to be represented by such painting, engraving, or caricature.

. . . .

Art. 1292. . . . **Scope of title.**—This title regulates the law with regard to libel when prosecuted as a penal offense, and is not intended to affect civil remedies for the recovery of damages.

Penal Code and Code of Criminal Procedure, 39th Leg., R.S., § 1, arts. 1269, 1274, 1275, 1276, 1925 Tex. Crim. Stat. 2, 290–91, 293, *repealed by* Act of May 24, 1973, § 3, 1973 Tex. Gen. Laws 883, 991, 994.

[15] Act approved Mar. 26, 1901, 27th Leg., R.S., ch. 26, § 1, 1901 Tex. Gen. Laws 30, 30, *repealed and codified by* Revised Statutes, 32nd Leg., R.S., § 1, art. 5595, § 4, 1911 Tex. Rev. Stat. 2, 1181 (codification), 1719 (repealer), *repealed and recodified by* Revised Statutes, 39th Leg., R.S., § 1, art. 5430, § 2, 1925 Tex. Rev. Stat. 2, 1530 (codification) ("A libel is a defamation expressed in printing or writing, or by signs and pictures, or drawings tending to blacken the memory of the dead, or tending to injure the reputation of one who is alive, and thereby expose him to public hatred, contempt or ridicule, or financial injury, or to impeach the honesty, integrity, or virtue, or reputation of any one, or to publish the natural defects of any one and thereby expose

---

intended to amend or repeal any penal law on the subject of libel.[16]

We are not persuaded that Cunningham and Lozano's letters were published when their contents were orally reported to CPS.

*Slander claim not tried by consent*

Unpleaded claims or defenses that are tried by express or implied consent of the parties are treated as if they had been raised by the pleadings. *Roark v. Stallworth Oil & Gas, Inc.*, 813 S.W.2d 492, 495 (Tex. 1991). If a party allows an issue to be tried by consent and fails to raise the lack of a pleading before submission of the case, it cannot raise the pleading deficiency for the first time on appeal. *Id.* These rules have been applied to summary-judgment proceedings. *Id.*

Assuming without deciding that parties may try issues by consent on a TCPA motion to dismiss, we cannot conclude that Cunningham or Lozano tried a slander claim by consent. Cunningham and Lozano did not fail to raise the lack of pleading before submission of the TCPA motion. In the hearing on the motion, counsel for Cunningham and Lozano argued that the Waymires failed to present clear and specific evidence of defamation because they pleaded libel rather than slander:

---

such person to public hatred, ridicule, or financial injury."), 2419 (repealer), *repealed and recodified by* Act of May 17, 1985, § 1, sec. 73.001, § 9, 1985 Tex. Gen. Laws 3242, 3298 (codification), 3322 (repealer) (current version at Tex. Civ. Prac. & Rem. Code Ann. § 73.001).

[16] Act approved Mar. 26, 1901, 27th Leg., R.S., ch. 26, § 4, 1901 Tex. Gen. Laws 30, 30, *repealed and codified by* Revised Statutes, 32nd Leg., R.S., § 1, art. 5598, § 4, 1911 Tex. Rev. Stat. 2, 1181 (codification), 1719 (repealer), *amended by* Act approved Apr. 9, 1917, 35th Leg., R.S., ch. 206, 1, 1917 Tex. Gen. Laws 474, 474, *repealed and recodified by* Revised Statutes, 39th Leg., R.S., § 1, art. 5433, § 2, 1925 Tex. Rev. Stat. 2, 1530 (codification) ("**Construction.—** Nothing in this title shall be construed to amend or repeal any penal law on the subject of libel, nor to take away any now or at any time heretofore existing defense to a civil action for libel, either at common law or otherwise, but all such defenses are hereby expressly preserved."), 2419 (repealer), *repealed and recodified by* Act of May 17, 1985, § 1, sec. 73.006, § 9, 1985 Tex. Gen. Laws 3242, 3298 (codification), 3322 (repealer) (current version at Tex. Civ. Prac. & Rem. Code Ann. § 73.006).

So let me tell you why the plaintiffs have failed to bring forth clear and specific evidence sufficient to create a prima facie case of each element of those three causes of action. First, defamation, plaintiffs do not plead slander. They don't plead defamation. They plead liable [sic].

Liable [sic], as we all know, is written speech. The basis of their liable [sic] claim is that defendants Lozano and Cunningham sent a letter to CPS. That never happened. Lozano and Cunningham sent a draft of a letter to Christi Waymire. But the letter was never sent. Neither defendant, both have denied this under oath, and there is no proof from the plaintiffs that—that anything else ever happened.

Both defendants have denied that the letter they sent to Christi Waymire was ever sent to CPS. So the liable [sic] claim is gone on the basis of that alone, because they don't plead oral communication. The fact is that CPS doesn't take written complaints. They always take them orally. So there is nobody who's saying there wasn't oral communication between the defendants and CPS. But as plead by the plaintiffs as liable [sic], no proof, zero, nil, zilch, nada.

Consequently, we must reject the Waymires' argument that the parties tried the slander claim by consent.

### b. Objectively verifiable false statement of fact

Cunningham and Lozano also argue that the Waymires have no evidence that Cunningham or Lozano made an "objectively verifiable false statement of fact." However, Cunningham's and Lozano's argument in this regard consists of two sentences with no citation to the record or authorities. The Waymires nonetheless provided a substantive response. Cunningham and Lozano complain in reply that the Waymires' brief did not address the relevant statements of fact, but Cunningham's and Lozano's brief did not clearly identify which statements it contended were not objectively verifiable statements of fact.

Texas Rule of Appellate Procedure 38.1(i) requires appellants to present a brief that includes a clear and concise argument for each issue raised, with appropriate citations to legal authority and the record. Tex. R. App. 38.1(i). While

22

we are required to interpret appellate briefs reasonably and liberally, parties asserting error on appeal must put forth some specific argument and analysis citing the record and authorities in support of their argument. *In re R.H.W. III*, 542 S.W.3d 724, 742 (Tex. App.—Houston [14th Dist.] 2018, no pet.) (citing *San Saba Energy, L.P. v. Crawford*, 171 S.W.3d 323, 338 (Tex. App.—Houston [14th Dist.] 2005, no pet.)). An appellate court has no duty to perform an independent review of the record and applicable law to determine whether there was error in the lower court. *Id.* (citing *Canton–Carter v. Baylor Coll. of Med.*, 271 S.W.3d 928, 931–32 (Tex. App.— Houston [14th Dist.] 2008, no pet.)). When an appellant fails to make proper citations to authority or to the record or provide any substantive legal analysis, the issue is waived. *Id.* (citing Tex. R. App. P. 38.1(i) and *Canton–Carter*, 271 S.W.3d at 931).

Because Cunningham and Lozano did not develop this argument in their brief, it is waived. *See* Tex. R. App. P. 38.1(i); *San Saba Energy*, 171 S.W.3d at 338 (holding that, even though courts interpret briefing requirements reasonably and liberally, party asserting error on appeal still must put forth some specific argument and analysis, citing record and authorities in support of party's argument).[17]

With respect to the Waymires' libel claims, we therefore conclude the trial court did not err in denying the TCPA motion on (1) Gary's libel claims against

---

[17] In their reply brief, Cunningham and Lozano argue (1) the Waymires cannot show objectively false statements of fact because the Waymires did not plead defamation by innuendo or implication and (2) the Waymires cannot show objectively false statements of fact because Cunningham and Lozano were required to report their "concerns" to CPS. Cunningham and Lozano did not make these arguments in their original brief. We do not consider these issues raised for the first time in Cunningham's and Lozano's reply brief. *See Yeske v. Piazza Del Arte, Inc.*, 513 S.W.3d 652, 672 n.5 (Tex. App.—Houston [14th Dist.] 2016, no pet.) ("Yeske may not raise a new issue in his reply brief that was not discussed in his original brief, even if the new issue is raised in response to a matter in the appellee's brief but not raised in the appellant's original brief.").

Cunningham and Lozano and (2) Christi's libel claim against Lozano, but the trial court did err in denying the TCPA motion on Christi's libel claim against Cunningham.

## 2. Intentional infliction of emotional distress

To recover damages for intentional infliction of emotional distress, a plaintiff must establish that: (1) the defendant acted intentionally or recklessly; (2) the defendant's conduct was extreme and outrageous; (3) the defendant's actions caused the plaintiff emotional distress; and (4) the emotional distress was severe. *See Hoffman–La Roche Inc. v. Zeltwanger*, 144 S.W.3d 438, 445 (Tex. 2004); State Bar of Tex., Texas Pattern Jury Charges—General Negligence, Intentional Personal Torts & Workers' Compensation PJC 6.5 cmt. (2018). Cunningham and Lozano contend the Waymires have not shown a prima facie case of intentional infliction of emotional distress because they "fail to bring forth clear and specific evidence" of severe emotional distress. They also assert that intentional infliction of emotional distress is a "gap-filler" tort and that the Waymires failed to submit clear and specific evidence showing that the Waymires have no other remedy but this "gap-filler" tort.[18]

*Emotional distress*

To establish "severe" emotional distress, the plaintiffs must bring forth clear and specific evidence that they suffered distress so severe that no reasonable person could be expected to endure it. *GTE Sw., Inc. v. Bruce*, 998 S.W.2d 605, 618 (Tex. 1999). Severe emotional distress includes "all highly unpleasant mental reactions such as embarrassment, fright, horror, grief, shame, humiliation, and worry." *Id.*

---

[18] Cunningham and Lozano do not assert in their brief any other challenge to the trial court's order as to the intentional-infliction-of-emotional-distress claim.

Mere worry, anxiety, vexation, embarrassment, or anger are not enough, and there must be a high degree of mental pain and distress, but evidence of a physical manifestation is not required. *Long Canyon Phase II & III Homeowners Assoc.*, 517 S.W.3d at 223 (citing *Krishnan v. Sepulveda*, 916 S.W.2d 478, 487 n.3 (Tex. 1995), and *Parkway Co. v. Woodruff*, 901 S.W.2d 434, 444 (Tex. 1995)).

In their affidavits, Christi and Gary testified that Cunningham's actions have caused them to feel persistent anxiety, helplessness, vulnerability, fear, trauma over what the children have experienced, emotional turmoil, emotional exhaustion, and physical exhaustion. The Waymires "live in fear of what [Christi's] father will do next and how he will act on his threats." Christi believes her "father seeks to continue intimidating [her] and [her] family for as long as [the Waymires] remain together." The Waymires fear their children's other parents might not return them from weekend visitations because of Cunningham's accusations. The Waymires have been unable to sleep. Gary's blood pressure is elevated, and Christi's appetite has decreased. Gary daily encourages Christi to eat. After filing suit, and obtaining a temporary restraining order against Christi's father, the Waymires were so nervous and scared about how Christi's father would react that they could not sleep in their own home; they checked into a hotel for a couple days. Christi's father continued to contact her in spite of the restraining order, and the Waymires worry he "might be plotting a violent revenge." The Waymires attest that Christi's father owns hundreds of guns and keeps a private jail cell in his home. Gary's affidavit states, "We are absolutely terrified to see him act on his threat to use any means to remove our children from the household." The Waymires sought counseling to address the impact of these events on their marriage. The Waymires also explored the Texas Confidentiality Program to keep safe from Christi's father. This evidence constitutes clear and specific, prima facie evidence that the Waymires suffered emotional

distress so severe that no reasonable person could be expected to endure it.

Cunningham and Lozano cite *Camp v. Patterson* as an example of a case in which the plaintiff suffered emotional distress that did not constitute prima facie, clear and specific evidence of severe emotional distress. No. 03-16-00733-CV, 2017 WL 3378904 (Tex. App.—Austin Aug. 3, 2017, no pet.) (mem. op.). In that case, the evidence of severe emotional distress was conclusory and cursory. *See id.* at *9–10. The party claiming emotional distress only stated in an affidavit that she suffered "tremendous emotional distress, including but not limited to, loss of sleep, loss of appetite, depression and anxiety" and that she was so "terrified" that she reported the conduct to the police. *See id.* at *9. By contrast, the Waymires live in constant fear of their children being taken away. In addition to experiencing "loss of sleep, loss of appetite, depression and anxiety" and reporting Cunningham to the police, the Waymires sought counseling, obtained a restraining order, did not feel safe in their own home, and considered the Texas Confidentiality program.

Cunningham and Lozano also cite *Regan v. Lee* for the proposition that when an individual did not seek professional help, the individual did not suffer severe emotional distress. 879 S.W.2d 133 (Tex. App.—Houston [14th Dist.] 1994, no writ). In *Regan*, the plaintiff sought damages for intentional infliction of emotional distress from a motorist who used vulgar language during a traffic altercation. *Id.* at 134. The plaintiff's evidence of emotional distress consisted of the plaintiff's own testimony that, "she was '[v]ery angry,' humiliated, and suffered from depression as a result of the incident because she could not explain to her children why appellant spoke to her in the manner that he did. She did not seek professional help, nor is there any evidence of pecuniary loss." *Id.* at 136. The court found that this evidence was legally insufficient because it did not set out the severity of the mental anguish suffered by the plaintiff. *Id.* at 136–37. The court did not hold, as Cunningham and

26

Lozano suggest, that the failure to seek medical assistance may by itself be a sufficient ground to find the evidence is not legally sufficient, or as applicable in our case, clear and specific, prima facie evidence of severe emotional distress. And in this case, the Waymires did seek counseling.

We conclude the Waymires have presented clear and specific evidence of severe emotional distress.

### Gap-filler tort

Cunningham and Lozano also assert that the Waymires failed to submit clear and specific evidence showing that the Waymires have no other remedy but the "gap-filler" tort of intentional infliction of emotional distress. They do not assert that this showing is an essential element of intentional infliction of emotional distress, nor do they cite any authority in support of this proposition. Cunningham and Lozano do not assert that the gravamen of the Waymires' claims for intentional infliction of emotional distress is defamation or another tort, nor do they present analysis or argument in support of this proposition. Although they cite two cases and explain the "gap-filler" nature of this tort, they provide no analysis of the evidence or citation to the record. Rule 38.1(i) of the Texas Rules of Appellate Procedure requires appellants to present a brief that includes a clear and concise argument for each issue raised, with appropriate citations to legal authority and the record. Tex. R. App. P. 38.1(i). While we are required to interpret appellate briefs reasonably and liberally, parties asserting error on appeal must put forth some specific argument and analysis citing the record and authorities in support of their argument. Even construing Cunningham's and Lozano's opening brief liberally, we cannot conclude that they adequately briefed an argument that the trial court erred in denying their motion to dismiss due to the "gap-filler" nature of the intentional-infliction-of-emotional-distress tort. *See Fox v. Alberto*, 455 S.W.3d 659, 663 n.1 (Tex. App.—Houston

27

[14th Dist.] 2014, pet. denied); *San Saba Energy*, 171 S.W.3d at 338. Therefore, we find briefing waiver as to this argument. *See Fox*, 455 S.W.3d at 663 n.1; *San Saba Energy*, 171 S.W.3d at 338. Even if Cunningham and Lozano had briefed this argument sufficiently in their reply brief, they may not avoid this waiver by briefing the argument for the first time in their reply brief. *See In re Guardianship of Whitt*, 407 S.W.3d 495, 497 n.3 (Tex. App.—Houston [14th Dist.] 2013, no pet.).

Thus, Cunningham and Lozano have not shown that the trial court erred in denying the TCPA motion as to the intentional-infliction-of-emotional-distress tort.

### 3. Negligence

To prove a negligence claim, a plaintiff must show (1) defendant owed the plaintiff a legal duty, (2) defendant breached that duty, and (3) the breach proximately caused damages to plaintiff. *Nabors Drilling, U.S.A., Inc. v. Escoto*, 288 S.W.3d 401, 404 (Tex. 2009).

Cunningham and Lozano contend the Waymires have not shown a prima facie case of negligence because Cunningham and Lozano had no duty to the Waymires.

The Waymires respond that this "no duty" argument ignores the statutory requirement set forth in Family Code section 261.104(3) that a person making a CPS report should identify "any other pertinent information concerning the alleged or suspected abuse or neglect." Tex. Fam. Code Ann. § 261.104(3). The Waymires also cite *White v. Zhou Pet*, a lawsuit involving a corporation and shareholders, for the proposition that failing to disclose information when there is a duty to speak is actionable. 452 S.W.3d 527, 537 (Tex. App.—Houston [14th] 2014, no pet.). The Waymires contend they made "a prima facie showing that Cunningham and Lozano failed to make a full disclosure to CPS, and that they failed to use ordinary care in making the CPS reports and in ascertaining the accuracy of the information they

28

gave to CPS."

However, as Cunningham and Lozano assert, this alleged duty to provide all pertinent information was not a duty to the plaintiffs; Cunningham and Lozano were required to report suspicions of child endangerment to CPS, not to the plaintiffs. *See* Tex. Fam. Code Ann. § 261.103(c) ("[A] report . . . must be made to the department if the alleged or suspected abuse or neglect involves a person responsible for the care, custody, or welfare of the child."). Because the Waymires did not show that Cunningham and Lozano had a duty to them, they failed to show a prima facie case of negligence. *See Centeq Realty, Inc. v. Siegler*, 899 S.W.2d 195, 197 (Tex. 1995) ("The threshold inquiry in a negligence case is whether the defendant owes a legal duty to the plaintiff."). We hold the trial court erred in denying the TCPA motion on these claims.

### 4. Conspiracy

As to the Waymires' conspiracy claims, civil conspiracy is a theory of vicarious liability, not an independent tort. *Agar Corp., Inc. v. Electro Circuits Int'l, LLC*, 580 S.W.3d 136, 142 (Tex. 2019). Civil conspiracy is "derivative" such that it is "connected to the underlying tort and survives or fails alongside it." *Id.* at 140–41; *see Tilton v. Marshall*, 925 S.W.2d 672, 681 (Tex. 1996); *see also* State Bar of Tex., Texas Pattern Jury Charges—Business, Consumer, Insurance & Employment PJC 109.1 (2018) (stating that conspiracy question conditioned on findings of statutory violation or tort other than negligence).

Cunningham and Lozano argue that the Waymires' conspiracy claims are not supported by any unlawful act. In support of their conspiracy claims, the Waymires' petition alleges, "The unlawful purposes Defendants sought to accomplish w[ere] fraud and defamation of character." The Waymires did not allege fraud; however, they did establish a prima facie case against Cunningham or Lozano for libel, which

29

is a form of defamation. Under a liberal construction, the Waymires' pleading suffices to assert the vicarious-liability theory of conspiracy to commit libel. As such, this vicarious-liability theory "survives alongside" their libel claims. *See Agar Corp.*, 580 S.W.3d at 140–41. The trial court did not err in denying the TCPA motion on this theory. Because the Waymires met their prima facie burden with respect to their libel claims against Lozano, Gary's libel claim against Cunningham, their intentional infliction-of-emotional-distress claims against Cunningham and Lozano, and their conspiracy-to-commit-libel theory, but did not meet their burden on Christi's libel claim against Cunningham or their negligence claims against Cunningham and Lozano, we sustain in part, and overrule in part, Cunningham's and Lozano's second issue.

## D.    Affirmative defenses

In their final issue, Cunningham and Lozano contend they have proven each essential element of affirmative defenses to the Waymires' claims. Even if a nonmovant establishes a prima facie case under the TCPA, "the court shall dismiss a legal action against the moving party if the moving party establishes by a preponderance of evidence each essential element of a valid defense to the nonmovant's claim." TCPA § 27.005(d).

### 1.  Defamation Mitigation Act

Cunningham and Lozano first assert the Waymires' defamation cause of action is barred by the Waymires' failure to comply with the Defamation Mitigation Act ("DMA"). *See* Tex. Civ. Prac. & Rem. Code Ann. §§ 73.051–.062. Under the DMA, a person may maintain an action for defamation only if: "(1) the person has made a timely and sufficient request for a correction, clarification, or retraction from the defendant; or (2) the defendant has made a correction, clarification, or retraction." DMA § 73.055(a). A request for correction, clarification, or retraction is

30

timely if it is made during the period of limitations applicable to a claim for defamation. DMA § 73.055(b). A person who does not request a correction, clarification, or retraction within ninety days after receiving knowledge of a publication may not recover exemplary damages. DMA § 73.055(c).

A defendant in a suit to which the DMA applies who does not receive a timely and sufficient written request for correction, clarification, or retraction "may file a plea in abatement not later than the 30th day after the date the person files an original answer in the court in which the suit is pending." DMA § 73.062(a). The suit is "automatically abated, in its entirety, without the order of the court," beginning on the eleventh day after the date the plea in abatement is filed if the plea in abatement: "(1) is verified and alleges that the person against whom the suit is pending did not receive the written request as required by Section 73.055; and (2) is not controverted in an affidavit filed by the person bringing the claim before the 11th day after the date on which the plea in abatement is filed." DMA § 73.062(b). The abatement continues until the 60th day after the date the written request is served or a later date agreed to by the parties. DMA § 73.062(c).

Cunningham and Lozano assert that the Waymires failed to comply with the DMA, and as a result, their defamation claims should be dismissed. The Waymires concede they did not comply with the DMA but assert that abatement, not dismissal, is the proper remedy.

This is an issue of first impression for this court.[19] Cunningham and Lozano rely on a case in which the Fifth Circuit considered the issue and held a plaintiff's claim failed as a matter of law under the DMA because the plaintiff failed to request

---

[19] This court previously determined that the DMA tolled the 60-day period for filing motions to dismiss under TCPA. *Hearst Newspapers, LLC v. Status Lounge, Inc.*, 541 S.W.3d 881, 889–894 (Tex. App.—Houston [14th Dist.] 2017, no pet.).

31

a modification or retraction. *See Tubbs v. Nicol*, 675 F. Appx. 437, 439 (5th Cir. 2017) (per curiam) (unpublished). This per curiam opinion is unpublished and not precedential. *See* 5th Cir. R. 47.5.4; *Tooker v. Alief Indep. Sch. Dist.*, 522 S.W.3d 545, 564 (Tex. App.—Houston [14th Dist.] 2017, no pet.). *Tubbs* is not binding precedent, and we do not find it persuasive. *See Tubbs*, 675 F. Appx. at 439.

There is a split of authority in Texas intermediate appellate courts as to whether failure to make a timely and sufficient retraction request pre-suit is a bar to litigation or just a preclusion of recovery of exemplary damages. The Texas Courts of Appeals in Dallas and Austin, after construing the entire statute, have both interpreted the provisions of the DMA as meaning that the consequence for failing to timely make a request is not dismissal, but rather preclusion of recovery of exemplary damages. *Warner Bros. Entm't, Inc. v. Jones*, 538 S.W.3d 781, 812 (Tex. App.—Austin 2017, pet. granted) ("We agree that . . . the consequence for failing to timely make a request is not dismissal, but rather preclusion of recovery of exemplary damages."); *Hardy v. Commc'n Workers of Am. Local 6215 AFL-CIO*, 536 S.W.3d 38, 47 (Tex. App.—Dallas 2017, pet. denied) ("If a plaintiff's claim were subject to dismissal solely due to her failure to request a correction, clarification, or retraction of the statement, a defendant would have no need to ever challenge whether a request was timely.").

The Dallas Court of Appeals in *Hardy* was the first appellate court to consider the issue of whether a plaintiff's lawsuit is subject to dismissal through a no-evidence summary judgment because she failed to make a request that complied with the DMA. 536 S.W.3d at 44–45. The court construed the statute to mean that the plaintiff's claim "is not subject to dismissal solely based on the plaintiff's failure to timely and sufficiently request a correction, clarification, or retraction." *Id.* at 48. The *Hardy* court found the Fifth Circuit's unpublished opinion in *Tubbs*

unpersuasive. *Id.* at 44 n.4. According to the court in *Hardy*, in affirming the grant of summary judgment, the Fifth Circuit in *Tubbs* "failed to construe the DMA in its entirety and did not address whether the abatement procedure set out in section 73.062 of the statute indicated an intent by the Legislature that a plaintiff's defamation claim was not subject to dismissal solely based on a failure to comply with section 73.055(a)." *Id.*

Other Texas courts have since agreed with *Hardy*. *See Cummins v. Lollar*, No. 07-16-00337-CV, 2018 WL 2074636, at *8 (Tex. App.—Amarillo May 3, 2018, pet. denied) ("The only consequence for failing to make a request for retraction within ninety days is preclusion of recovery of exemplary damages, not dismissal."). In *Warner Brothers*, the Austin Court of Appeals agreed with *Hardy* that when the DMA is read in its entirety, and giving effect to all its provisions and considering the purpose of the statute, "the consequence for failing to timely make a request is not dismissal, but rather preclusion of recovery of exemplary damages." *Warner Bros. Entm't*, 538 S.W.3d at 812 (citing *Hardy*, 536 S.W.3d at 46–47 (citing DMA § 73.055(c); *Neely*, 418 S.W.3d at 63)). *But see Zoanni v. Hogan*, 555 S.W.3d 321, 328 (Tex. App.—Houston [1st Dist.] 2018, pet. filed) ("The DMA is clear that one may maintain an action *only if* he sends a timely and sufficient request for correction, clarification, or retraction. [DMA] § 73.055. Once the deadline has passed, a plaintiff cannot maintain an action.") (emphasis in original).

According to the court in *Warner Brothers*, the DMA provisions which affect the damages recoverable by the plaintiff, along with the DMA's provision allowing a defendant to challenge the timeliness and sufficiency of a request for a correction, clarification, or retraction, indicate the Texas Legislature did not intend to deprive a plaintiff of a defamation claim based on a failure to request a correction, clarification, or retraction. 538 S.W.3d at 812–13. The court in *Hardy* further

explained that the DMA's procedure furthers the goals of providing for early resolution of disputes and providing a way for a defamation plaintiff to mitigate damages because it allows both for a pre-suit request for the defendant to mitigate the harm from allegedly defamatory statements, and if no request is made, for the defendant to move for abatement of the suit until the request is made. *Warner Bros. Entm't*, 538 S.W.3d at 813 (citing *Hardy*, 536 S.W.3d at 46–47, and DMA §§ 73.055(b) (establishing request made during limitation period for commencement of action is timely), .062 (describing abatement procedure)).

As pointed out by the *Hardy* court, "if a defendant who did not receive a request for correction, clarification, or retraction could simply seek dismissal of the action, there would be no need for either the limitation of damages or abatement provisions in the statute, and the purpose of the statute would be frustrated." 536 S.W.3d at 46 (citation omitted). In *Hardy*, because the plaintiff's claim was not subject to dismissal based on her failure to timely and sufficiently request a correction, clarification, or retraction, the court determined the defendants "were not entitled to prevail on a no-evidence motion for summary judgment on a ground that is not an essential element of [the plaintiff's] claim." *Id.* at 48. In *Warner Brothers*, the court agreed with the court's analysis in *Hardy* and concluded the plaintiff was "not required to establish a prima facie case of demand pursuant to Section 73.055 as an essential element of his defamation claim when resisting a TCPA motion to dismiss." *Warner Bros. Entm't*, 538 S.W.3d at 813.

We are persuaded by the reasoning of the *Hardy* court and the courts following *Hardy*. Consequently, we cannot conclude that the Waymires' failure to comply with the DMA constitutes an affirmative defense that requires dismissal of the Waymires' libel claims under the TCPA.

34

## 2. Statutory immunity, qualified privilege, and judicial communications privilege

Cunningham and Lozano also assert their reports to CPS are protected by the defenses of statutory immunity, qualified privilege, and the judicial communications privilege. In support of their statutory-immunity argument, Cunningham and Lozano point to Family Code section 261.101, which requires one who in good faith suspects child abuse to report it to CPS. *See* Tex. Fam. Code Ann. §§ 261.101, .103. In support of their qualified-privilege argument, Cunningham and Lozano state that qualified privilege protects communications made in good faith on a subject in which the author has an interest or duty to another person having a corresponding interest or duty. *See Pioneer Concrete of Tex., Inc. v. Allen*, 858 S.W.2d 47, 49 (Tex. App.—Houston [14th Dist.] 1993, writ denied) ("A 'conditional' or 'qualified' privilege protects communications made in good faith on a subject matter in which the author has a common interest with the other person, or with reference to which he has a duty to communicate to the other person."). In support of their assertion of the judicial-communications privilege, Cunningham and Lozano contend their reports to CPS cannot serve as the basis of civil actions for libel or slander because they were preliminary to a proposed judicial proceeding. *See Landry's, Inc. v. Animal Legal Defense Fund*, 566 S.W.3d 41, 58 (Tex. App.—Houston [14th Dist.] 2018, pet. filed) (judicial-communications privilege extends to statements made in contemplation of and preliminary to judicial proceedings).

We concluded above that the Waymires did not establish a prima facie case of libel or slander based on Cunningham's and Lozano's reports to CPS; rather, the Waymires' prima face evidence supporting their libel claims is the publication of the prepared letters to Christi and Cunningham. Cunningham and Lozano have not argued, much less established, that statutory immunity, qualified privilege, or the judicial communications privilege apply to these communications to Christi or

35

Cunningham. The trial court did not err by not applying these doctrines to the Waymires' claims.

We overrule Cunningham's and Lozano's third issue.

## III.  CONCLUSION

We affirm the trial court's order insofar as it denied Cunningham's and Lozano's motion to dismiss on the Waymires' libel claims against Lozano, Gary's libel claim against Cunningham, the Waymires' intentional-infliction-of-emotional-distress claims against Cunningham and Lozano, and the Waymires' vicarious-liability theory of conspiracy to commit libel. We reverse the trial court's order insofar as it denied the motion to dismiss on Christi's libel claim against Cunningham, and the Waymires' negligence claims against Cunningham and Lozano.


/s/     Charles A. Spain
        Justice


Panel consists of Chief Justice Frost and Justices Spain and Poissant.